COLORADO OFFICE OF CONSUMER COUNSEL, Petitioner–Appellant,

v.

The PUBLIC UTILITIES COMMISSION of the State of Colorado; and Arnold H. Cook, Andra Schmidt, and Ronald L. Lehr, Commissioners; and The Mountain States Telephone and Telegraph Company, Respondents–Appellees,

and

The Colorado Municipal League; Competitive Telecommunications Association; The Colorado Association of Radio Common Carriers; Colorado Ski Country U.S.A.; The Department of Defense and other Federal Executive

Agencies; US Sprint Communications Corporation; The Agate Mutual Telephone Exchange, Big Sandy Telecommunications, Inc., The Bijou Telephone Cooperative Association, Inc., Columbine Telephone Company, Delta County Cooperative Telephone Company, Eastern Slope Rural Telephone Company, Inc., Farmers Mutual Telephone Company, Sunflower Telephone Company, Inc., Wiggins Telephone Association, Nucla–Naturita Telephone Company, Pine Drive Telephone Company, doing business as JED Enterprises, Inc., The S & T Telephone Cooperative Association, Inc., and Universal Telephone Company of Colorado; and AT & T Communications of the Mountain States, Inc., Intervenors–Appellees.

The COLORADO MUNICIPAL LEAGUE and Comptel of Colorado and Wyoming, Plaintiffs–Appellants,

v.

The PUBLIC UTILITIES COMMISSION of the State of Colorado; and Arnold H. Cook, Andra Schmidt, and Ronald L. Lehr, Commissioners, Defendants–Appellees,

and

The Mountain States Telephone and Telegraph Company; The Staff of the Commission; The Colorado Office of Consumer Counsel; AT & T Communications; U.S. Sprint; MCI; Denver Burglar Alarm; Colorado Ski Country; Agate Mutual Telephone Exchange, et al., The Colorado Association of Radio Common Carriers, and The Secretary of Defense, Co-defendants–Appellees.

No. 88SA451.

Supreme Court of Colorado,
En Banc.

Feb. 5, 1990.

Rehearing Denied March 5, 1990.

---

Anthony Marquez, First Asst. Atty. Gen., and Sue E. Weiske, Asst. Atty. Gen., Denver, for petitioner-appellant.

John E. Archibold, Denver, for The Public Utilities Com'n of the State of Colo.

Eiberger, Stacy, Smith & Martin, David Stacy, David H. Jett and Russell P. Rowe, Denver, for Mountain States Tel. and Tel. Co.

Gorsuch, Kirgis, Campbell, Walker and Grover, Joseph B. Wilson and Dudley Spiller, Jr., Denver, for Colorado Mun. League and Comptel of Colorado and Wyoming.

Ireland, Stapleton, Pryor & Pascoe, Tucker K. Trautman, George D. Rosenberg and T. Larry Barnes, Denver, for AT & T Communications of the Mountain States, Inc.

William Levis and Mark N. Jason, Denver, for MCI Telecommunications.

No appearance by intervenors-appellees Competitive Telecommunications Ass'n, The Colorado Ass'n of Radio Common Carriers, Colorado Ski Country U.S.A., The Dept. of Defense and Other Federal Executive Agencies, US Sprint Communications Corp., The Agate Mutual Telephone Exchange, Big Sandy Telecommunications, Inc., The Bijou Telephone Co-op Ass'n, Inc., Columbine Telephone Co., Delta County Co-op Telephone Co., Eastern Slope Rural Telephone Co., Inc., Farmers Mut. Telephone Co., Sunflower Telephone Co., Inc., Wiggins Telephone Ass'n, Nucla–Naturita Telephone Co., Pine Drive Telephone Co., d/b/a JED Enterprises, Inc., The S & T Telephone Co-op. Ass'n, Inc. and Universal Telephone Co. of Colorado.

No appearance for co-defendants-appellees US Sprint, Denver Burglar Alarm, Colorado Ski Country, Agate Mut. Telephone Exchange, et al., The Colorado Ass'n of Radio Common Carriers and The Secretary of Defense.

Justice ERICKSON delivered the Opinion of the Court.

This is an appeal from the order of the Denver District Court denying relief and affirming the decisions of the Colorado Public Utilities Commission (Commission) in a major restructuring of telephone rates. *See* § 40–6–115(5), 17 C.R.S. (1984). The appellants [1] claim that the Commission's action in generally approving Mountain States Telephone and Telegraph Company's

1. The appellants are the Colorado Office of Con- sumer Counsel (Consumer Counsel), the Colora-

(Mountain Bell's) proposed rates and tariffs was not supported by substantial evidence in the record, and was arbitrary and capricious. In addition, appellants argue that the decisions of the Commission authorize an illegal price squeeze, in violation of state law. We affirm.

## I.

This appeal involves the first significant telephone rate restructure proceeding before the Commission since 1977, and followed the breakup of the Bell System pursuant to the modification of final judgment order (MFJ) entered in *United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

The MFJ required AT & T to divest itself of the twenty-two Bell Operating Companies (BOCs), including Mountain Bell. In addition, under the terms of the MFJ, all Bell territory in the continental United States was divided into geographically based "local access and transport areas" (LATAs).[2] *United States v. Western Elec. Co.,* 569 F.Supp. 990 (D.D.C.1983). The MFJ permits a BOC to provide telecommunication services within a LATA (intra-LATA), but a BOC is prohibited from carrying calls between LATAs (interLATA or interexchange telecommunications), *United States v. AT & T,* 552 F.Supp. at 227.

Colorado is divided into two LATAs. The Colorado Springs LATA includes Colorado Springs, Pueblo, and southeastern Colorado. The Denver LATA consists of Denver and most of western and northern Colorado. *United States v. Western Elec. Co.,* 569 F.Supp. at 1049.

Only interexchange carriers such as AT & T and the "other common carriers" (OCCs) are allowed to provide interLATA telecommunication services. Interexchange carriers are commonly referred to as long-distance companies.[3] The MFJ did not prohibit interexchange carriers from competing in the intraLATA market. *Id.* at 994 n. 16. Whether interexchange carriers would be authorized to so compete was left to state and local regulation. The interexchange carriers that are authorized (or "certificated") to operate within Colorado are AT & T Communications of the Mountain States, Inc. (AT & T), MCI, US Sprint Communications Corporation (Sprint), Western Union, and Telephone Electronics Corporation West.

After divestiture on January 1, 1984, the General Assembly enacted the Intrastate Telecommunications Services Act, §§ 40–15–101 to –110, 17 C.R.S. (1984).[4] Relevant sections of the Act provide that intrastate telecommunications services providers are public utilities subject to regulation by the Commission, § 40–15–102, that intrastate providers are required to obtain a certifi-

---

do Municipal League (League), and Comptel of Colorado and Wyoming (Comptel).

**2.** The term LATA was developed because of confusion over the use of the word "exchange" in two different senses. The first sense in which "exchange" is used is in "local exchange," an area created by local state regulators. At the time that most LATAs were approved by the court, there were about 7,000 Bell local exchange areas in the continental United States. *United States v. Western Elec. Co.,* 569 F.Supp. at 993 n. 9. A local exchange is identified by the first three digits of an average telephone number. *Id.* at 995 n. 18. The MFJ used the term "exchange" in a different way. As explained in the text, an "exchange" in the MFJ was the area within which a BOC could operate, and it comprises a much larger area than a local exchange. *Id.* at 994–95. An "exchange" created by the MFJ is a LATA. *Id.* at 993 n. 9.

**3.** "Long-distance company" is somewhat misleading since BOCs are also allowed to carry long-distance (or "toll") calls so long as they originate and terminate within a single LATA. *United States v. Western Elec. Co.,* 569 F.Supp. at 995. Interexchange carriers are also called IXCs or IECs.

**4.** In 1987, after the decisions of the Commission in this case, the General Assembly repealed and reenacted the Intrastate Telecommunications Services Act with significant changes and amendments. §§ 40–15–101 to –404, 17 C.R.S. (1989 Supp.). For reasons that will be developed in the opinion, we conclude that the 1987 Act is inapplicable to the proceedings before the PUC in this case. References in the opinion are to the former Act, unless otherwise noted.

cate of public convenience and necessity from the Commission, § 40–15–103, that the provision of services intraLATA shall be governed by the doctrine of regulated monopoly,[5] § 40–15–104(2), but that the doctrine of regulated competition[6] shall prevail with respect to interLATA services, § 40–15–104(1).

In Phase I of Investigation and Suspension Docket No. 1700 (I & S 1700) the Commission entered a decision entitling Mountain Bell to a revenue increase of $21,113,000. Mountain Bell was permitted to increase its rates across the board to reap the revenue increase. Left undecided was the manner in which Mountain Bell's rates would ultimately be restructured. Rather than advancing directly to the Phase II rate restructure (spread-of-the-rates) proceeding, the Commission closed I & S 1700. On July 25, 1986 Mountain Bell filed Advice Letter 2041 with 420 tariff sheets proposing rate changes in five general areas: (1) basic exchange service; (2) intraLATA toll; (3) interLATA access; (4) private line and special access; and (5) ancillary services. Principally, Mountain Bell requested that intraLATA toll and interLATA access rates be decreased, and basic exchange, private line, and special access charges be increased.

On August 14, 1986, the Commission suspended the effective dates of the tariffs proposed by Mountain Bell, pending a hearing on their propriety. *See* § 40–6–111(1), 17 C.R.S. (1984). The Commission also instituted I & S 1720, the rate restructure docket. Various parties, including appellants, were permitted to intervene and submit objections to the proposed changes. In support of its rate proposals, Mountain Bell submitted two different cost-of-service studies. The Commission Staff also filed its own cost-of-service study. On Decem-

ber 29, 1986, Mountain Bell, AT & T, and the Commission Staff jointly submitted a contested settlement agreement to the Commission. Hearings for the reception of prefiled testimony and exhibits into evidence, as well as cross-examination of witnesses, were held in the second half of January and on February 4, 5, and 6, 1987. Public testimony was received December 30, 1986, January 7 and 9, 1987, and February 12 and 13, 1987.

By decision dated March 20, 1987, the Commission, with some exceptions, generally accepted the contested settlement agreement. The Commission rejected both cost studies done by Mountain Bell, but adopted the Staff study as reasonable. IntraLATA toll and interLATA access rates were decreased, and basic exchange, private line, and special access charges were increased. Commissioner Lehr dissented in part. On April 9, 1987, appellants Consumer Counsel, League, and Comptel, and MCI, filed applications for rehearing, reargument, or reconsideration. On the same day AT & T filed an application for partial rehearing, reargument, or reconsideration. The application of Consumer Counsel was granted in part and the original decision was modified in two minor respects. The other applications were denied. Consumer Counsel and League then filed applications for rehearing, reargument, or reconsideration from the modified decision. These applications were denied by decision dated June 5, 1987.

The Consumer Counsel petitioned the district court for review of the three decisions of the Commission pursuant to section 40–6–115, 17 C.R.S. (1984), while the League and Comptel filed an action for judicial review of the same decisions under section 24–4–106, 10A C.R.S. (1988). The two proceedings were consolidated in the district

---

**5.** "Regulated monopoly" is defined as "the doctrine by which, within a defined geographical area, telecommunications service may be furnished only by a single provider." § 40–15–101(8), 17 C.R.S. (1984).

**6.** " 'Regulated competition' means the doctrine by which telecommunications service may be

furnished by two or more providers of such service in this state, notwithstanding the fact that said service provided by an existing provider may or may not be substantially inadequate." § 40–15–101(7), 17 C.R.S. (1984).

court. By written decision dated November 3, 1988, the district court denied the relief requested and affirmed the decisions of the Commission. This appeal followed.

## II.

The standards for judicial review of decisions of the Commission are contained in section 40–6–115(3), 17 C.R.S. (1984):

(3) Upon review, the district court shall enter judgment either affirming, setting aside, or modifying the decision of the commission. So far as necessary to the decision and where presented, the district court shall decide all relevant questions of law and interpret all relevant constitutional and statutory provisions. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

Our standard of review is the same as for the district court. *See* § 40–6–115(5), 17 C.R.S. (1984); *City of Montrose v. Public Util. Comm'n,* 197 Colo. 119, 121, 590 P.2d 502, 504 (1979).

Judicial review of an administrative decision of the Commission is thus limited to three concerns: whether the Commission has regularly pursued its authority; whether its decision is just and reasonable; and whether the decision is supported by substantial evidence in the record viewed as a whole. *Colorado Municipal League v. Mountain States Tel. & Tel. Co.,* 759 P.2d 40, 44 (Colo.1988). In determining whether the decision is supported by substantial evidence, a court must view the evidence in the record in the light most favorable to the Commission. *Atchison, T. & S.F. Ry. v. Public Util. Comm'n,* 763 P.2d 1037, 1041 (Colo.1988). The reviewing court must search the record as a whole to determine whether the administrative decision is supported by substantial evidence since findings may either be express or implied from a reading of the entire record. *Id.* The Commission's findings need not be in any particular form, but may be implied from other facts. *Office of Consumer Counsel v. Public Util. Comm'n,* 752 P.2d 1049, 1055 (Colo.1988).

Whether or not an administrative decision is supported by substantial evidence is a question of law for the court. *Atchison, T. & S.F. Ry.,* 763 P.2d at 1042. With these well-settled principles of review in mind, we turn to the various contentions of the appellants.

## III.

The League and Comptel first claim that the rates adopted by the Commission constitute an illegal price squeeze in violation of sections 40–3–102 and 40–3–106, 17 C.R.S. (1984), and section 40–15–105(1), 17 C.R.S. (1989 Supp.). No federal antitrust violations are alleged. Section 40–3–102 gives the Commission the general authority to "regulate all rates, charges, and tariffs of every public utility of this state to correct abuses; to prevent unjust discriminations and extortions in the rates, charges, and tariffs of such public utilities of this state...."

Section 40–3–106(1)(a) provides:

**Advantages prohibited—graduated schedules.** (1)(a) Except when operating under paragraph (b) of this subsection (1), no public utility, as to rates, charges, service, or facilities, or in any other respect, shall make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any respect, either between localities or as between any class of service. The commission has the power to determine

any question of fact arising under this section.

The definition of price squeeze advanced by the appellants comes from *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1176 n. 4 (8th Cir.1982): "A price squeeze occurs when a vertically integrated company which has monopoly power at the wholesale level *but faces competition at the retail level sets its wholesale rates so high that its wholesale customers will be unable to compete with it in the retail market.*" (Emphasis added.) Appellants' theory is that there exist resellers of Mountain Bell's services in the intraLATA toll market who purchase these services at wholesale. There was some evidence in the record that the rates approved by the Commission for the provision of these services (access charges), in some mileage bands, and at some times of day, exceed the rates charged by Mountain Bell to its own customers for intraLATA toll calls. The theory assumes that the resellers are competitors of Mountain Bell in the intraLATA toll market, and posits that the resellers are unable to compete because of the discriminatory rates.

Section 40–1–103(1)(b)(III), 17 C.R.S. (1984), exempts from Commission regulation "entities which only resell to the general public intrastate long distance telephone services by using the tariff services and facilities of regulated telephone utilities." Interexchange carriers such as AT & T and the OCCs are not resellers and were prohibited from providing intraLATA toll services at the time of the Commission decisions.

The services sold by Mountain Bell and purchased by the interexchange carriers and resellers are for access to the telecommunications network owned by Mountain Bell in order that the carriers and resellers may complete interLATA calls. The rates set by the Commission for access are based on the costs of completing interLATA calls, and not for intraLATA calls. These "access charges" were in fact lowered by the Commission's decision. However, it is the interrelationship between the interLATA access charges and Mountain Bell's intraLATA toll rates that allegedly create the price squeeze. According to the appellants, the Commission should require Mountain Bell to impute to itself for purposes of intraLATA toll an access charge similar or identical to the one it charges the resellers.[7] In other words, Mountain Bell should be considered a customer of itself for purposes of the access charge.

We find the federal and out-of-state cases cited by appellants inapplicable to the facts and circumstances in Colorado. The fatal defect in the argument is that at the time the Commission's decisions were rendered in this case Mountain Bell held a statutory monopoly on the provision of intraLATA toll services. §40–15–104(2), 17 C.R.S. (1984). When the access rates and intraLATA toll rates were approved by the Commission, Mountain Bell had no legal competitors for the intraLATA toll market except for the resellers that accounted for only 0.3% of the market.

We conclude that the rates set by the Commission for interLATA access and intraLATA toll do not unreasonably discriminate against the resellers. The access charges were approved with interLATA access in mind. It is only because the resellers themselves choose to provide intraLATA long distance service using Mountain Bell's facilities that there is a discrepancy in rates. In addition, the alleged discrimination only occurs in some mileage bands and only at certain times of the day. Furthermore, because the resellers are by definition unregulated by the Commission, there is a rational basis for treating them differently than Mountain Bell which is regulated. Unlike Mountain Bell, the resellers can set their own rates and change them at will, choose the markets in which they wish to do business, and enter and leave those markets at will. *See Public*

---

7. For a discussion of imputation of access charges, see Dingwall, *Imputation of Access*

*Charges—A Prerequisite for Effective IntraLATA Toll Competition*, 40 Admin.L.Rev. 433 (1988).

*Util. Comm'n v. AT & T Communications,* 777 S.W.2d 363, 366–67 (Tex.1989) (access charges implemented by Texas Public Utility Commission were not unreasonably discriminatory in not imputing access charges on local exchange companies and in not treating local exchange companies as customers of themselves), *rev'g* 735 S.W.2d 866 (Tex.App.—Austin 1987) (relied on by the League and Comptel in their brief).

██ After the decisions of the Commission were handed down in this case, the General Assembly in 1987 repealed and reenacted the Intrastate Telecommunications Services Act with substantial changes. In particular, the Act no longer provides that intraLATA toll services are governed by the doctrine of regulated monopoly. *See* § 40-15-306, 17 C.R.S. (1989 Supp.). In addition, the General Assembly enacted section 40-15-105(1), 17 C.R.S. (1989 Supp.), which prohibits discriminatory access charges.

What effect, if any, this new section has or would have on the price-squeeze argument raised by appellants need not be decided, since we are convinced that section 40-15-105(1), enacted after the decisions of the Commission in this case, does not apply. The statute does not expressly state that it is to have retroactive application. Statutes are presumed to operate prospectively. § 2-4-202, 1B C.R.S. (1980); *Department of Highways v. Intermountain Terminal Co.,* 164 Colo. 354, 360, 435 P.2d 391, 394 (1967) (statute enacted subsequent to proceedings in trial court could not have been applicable). The Colorado Constitution prohibits retrospective legislation. Colo. Const. art. II, § 11; *see People in Interest of R.F.A.,* 744 P.2d 1202, 1204 (Colo.App.1987). We therefore reject the appellants' claim that the rates set by the Commission constitute illegal discrimination.

## IV.

The appellants also claim that the decisions of the Commission are not supported by substantial evidence and are arbitrary and capricious. The Consumer Counsel first argues that the Commission Staff's cost-of-service study was plagued by serious flaws and that the Commission's acceptance of the study was not supported by substantial evidence in the record or sufficient findings of fact. Second, the decision to price certain custom calling services below cost was inconsistent with the principle of setting rates based on the cost of providing the service. Third, the conclusion that private branch exchange (PBX) rates should be lowered to the regular business line rates is unsupported by substantial evidence. The Consumer Counsel claims that these erroneous determinations combined to unreasonably increase the rates paid by residential exchange and small business customers.

The League and Comptel agree with the Consumer Counsel that uncorrected errors in the Staff's cost-of-service study allowed unreasonable and excessive recovery from private line users. Even if the Staff study is accepted as reasonable, however, it only provided guidance in thirteen general categories. It provided no basis for the specific intra-category rates proposed by Mountain Bell and approved by the Commission. We will examine each of these contentions in turn.

## V.

The appellants challenge the Commission's acceptance of the Staff study because of six alleged uncorrected errors in the study: (1) the use of Subscriber Plant Factor to allocate access costs was arbitrary and capricious; (2) the allocation of traffic-sensitive costs between local and toll useage based on average minutes of use failed to account for the significantly greater costs of the first minute, resulting in an overstatement of costs for residential subscribers; (3) the assignment of loop-related maintenance costs on the basis of relative investment in the loop plant caused an overstatement of costs associated with resi-

dential loops;[8] (4) an over-assignment of investment costs to residential loops resulting from reliance on Mountain Bell's LAP-GAP analysis; (5) the failure to allocate loop circuit investments to residential users; and (6) the incorrect assumption that noncontinuous property extension (NCP) loops were all routed through Mountain Bell central offices.

### A.

■ Subscriber Plant Factor (SPF) is used by the Federal Communications Commission to allocate a utility's investment in station equipment, subscriber lines, and the non-traffic sensitive (NTS)[9] portion of office equipment between interstate and intrastate use. 47 C.F.R. §§ 67.2(b)(3)(iv), 67.124(d)(4) (1987). *See Cincinnati Bell Tel. Co. v. Public Util. Comm'n,* 12 Ohio St.3d 280, 288–89, 466 N.E.2d 848, 856 (1984), appeal dismissed for want of substantial federal question, 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986); *see also Rural Tel. Coalition v. FCC,* 267 U.S.App. D.C. 357, 361, 838 F.2d 1307, 1311 (D.C.Cir. 1988).

The Commission Staff used SPF in its study in order to allocate the joint costs[10] or investment in subscriber loops among the users of the loop, such as residential and business customers, interexchange carriers, and resellers. The Consumer Counsel introduced expert evidence that SPF was developed for allocation of costs between interstate and intrastate use, was essentially arbitrary as the result of political factors, and did not apply to intrastate rate setting. Based on the expert testimony of Warren L. Wendling, a member of

the Commission Staff who was responsible for the study, the Commission stated:

> In determining the allocation of customer access, the Staff has suggested the use of the Subscriber Plant Factor (SPF) as an interim measure. SPF has been used traditionally in the jurisdictional separations process in telecommunications at the federal level and is a commonly recognized and accepted method of allocation. While other methods may be used, it is important that they be based in some way on the configuration of the network and that they are uniformly applied. The Staff believes that SPF constitutes such an allocation methodology and recommends that it be adopted for the purposes of allocating customer access costs in this proceeding. We find that the Staff's recommendation is reasonable and should be adopted.

The Commission rejected Mountain Bell's method of allocation which placed all of the subscriber loop costs on the subscriber. Since the loop has many users—residential customers, small and large businesses, government, interexchange carriers, and resellers, among others—the Commission believed that all of the users should pay a fair proportion for access to the loop. The Consumer Counsel complains that the adoption of the SPF factor for allocation was arbitrary. The Commission had expert testimony from Dr. George Parkins, a member of the Staff, that all heretofore employed allocation methods were to some extent arbitrary. Another expert witness from the Staff, Warren L. Wendling, testified that while experts disagreed with respect to SPF, its use in this case was not arbitrary. Wendling also advocated the

---

**8.** A subscriber loop consists of the line from the customer's premises to the local exchange company's central office. *Rural Tel. Coalition v. FCC,* 267 U.S.App.D.C. 357, 360, 838 F.2d 1307, 1310 (D.C.Cir.1988).

**9.** "Non-traffic sensitive costs are those associated with the local exchange company's telephone plant that do not increase as traffic or usage increases, such as cables, poles, and telephone instruments." *Public Util. Comm'n v. AT & T Communications,* 777 S.W.2d at 364.

**10.** In the Staff study, "joint costs" referred to costs incurred when the provision of one service was automatically provided by the production of another service. An example is the cost of providing a subscriber loop which provides multiple service opportunities such as local service, long-distance (toll) service, and custom calling. Direct testimony of Warren L. Wendling at 11.

use of more sophisticated and exact methods of cost allocation in the future when the tools and necessary data were available.

The Commission is free to accept some expert testimony, and reject contrary testimony. *RAM Broadcasting of Colorado v. Public Util. Comm'n*, 702 P.2d 746, 750 (Colo.1985). Under these circumstances, we conclude that the Commission's decision to rely on a cost-of-service study that employed SPF as an interim allocation method was supported by substantial evidence in the record, and the Commission did not act arbitrarily in adopting it.

### B.

█ We also conclude from our review of the record that the Commission's decision to utilize the Staff study notwithstanding the cross-rebuttal testimony of Consumer Counsel witness Marvin H. Kahn was supported by substantial evidence. Dr. Kahn testified that in his opinion the Staff study contained three other errors: the allocation of traffic-sensitive costs between local and toll useage based on average minutes of use failed to account for the significantly greater costs of the first minute, resulting in an overstatement of costs for residential subscribers; the assignment of loop-related maintenance costs on the basis of relative investment in the loop plant caused an overstatement of costs associated with residential loops; and employing Mountain Bell's LAPGAP analysis resulted in an over-assignment of investment cost to residential loops.

In its original decision, the Commission stated that "the Staff did use dial-equipment minutes of use for traffic-sensitive costs which inherently give weight to the first minute and we find that was appropriate." On application for reconsideration, the Commission agreed with the Consumer Counsel that this information was contained in the Staff's Reply Statement of

Position, and the Commission had already held that it would not rely on reply statements of position for evidence. It therefore deleted the paragraph containing the above-quoted statement from the original decision.

Similarly, in the original decision, the Commission concluded in response to Dr. Kahn's objection regarding the assignment of loop-related maintenance costs that:

[T]he fact is that loop maintenance costs were subdivided by the Staff and were allocated in some cases on primarily the basis of investment, and in certain other minor cases on the basis of the number of loops. We would note, in any event, that the allocation of loop maintenance costs on the basis of investment is a long standing and sound principle of cost allocation.

On reconsideration, the Commission omitted the phrase "and in certain other minor cases on the basis of the number of loops" from the paragraph quoted above. The Commission conceded that the information omitted was contained only in the Staff's Reply Statement of Position, and was not otherwise in the record. The Commission apparently did not explicitly address Dr. Kahn's third objection with respect to the use of Mountain Bell's LAPGAP analysis.[11]

If our review of the record teaches anything it is that the experts' opinions varied wildly. Mountain Bell presented two different cost-of-service studies supported by its own expert testimony, but the Commission rejected both for reasons delineated in the original decision. The Staff experts disagreed with the methodologies adopted by Mountain Bell, and Mountain Bell's experts disagreed with the Staff. Appellants' experts disagreed with Mountain Bell and the Staff. In the face of these irreconcilable conflicts, we conclude that the Commission did not act arbitrarily and capriciously in accepting Staff's study notwithstanding Dr. Kahn's objections. *Mellow Yellow Taxi Co. v. Public Util Comm'n*, 644 P.2d 18, 20 (Colo.1982).

---

11. In its Reply Statement of Position, the Staff claimed that the correction proposed by Dr. Kahn would have little or no effect on the results of the study.

Perfect mathematical precision is not required in a cost-of-service study used in determining the reasonableness of thousands of individual charges and rates. More importantly, mathematical precision is not the standard by which we judge the Commission's actions. *E.g., City of Montrose v. Public Util. Comm'n*, 629 P.2d 619, 623 (Colo.1981). The Commission is charged with the public duty of overseeing public utilities and ensuring that the rates they charge are just and reasonable. §§ 40–3–101, –102, 17 C.R.S. (1984). It is the result reached and not the means employed which determines whether the decision of the Commission must be upheld. *City of Montrose v. Public Util. Comm'n*, 629 P.2d at 623. The cost-of-service study was only a tool or form of expert assistance that the Commission needed to rely on in performing its duty. The study itself was not the primary goal of the Commission and the decision to accept the study as reasonable was only an intermediate one. The explicit and implicit decisions of the Commission to reject criticisms of the study as minor were a relatively small part of this extremely complicated and difficult case. In the absence of evidence that the Staff study was inherently unsound, we will not insist that it be abandoned. *Id.* at 624. Mountain Bell had already obtained an across-the-board rate increase. The fundamental changes in the telecommunications industry since the last rate increase and spread-of-the-rates decision made it imperative for the Commission to redetermine appropriate relative rates.

Having said this, and while it is true the Commission's findings need not be in any particular form, but may be implied from other facts, *Office of Consumer Counsel v. Public Util. Comm'n*, 752 P.2d 1049, 1055, we are concerned with the absence of some specific findings of the Commission regarding objections to the Staff study. *See Caldwell v. Public Util. Comm'n*, 200 Colo. 134, 138, 613 P.2d 328, 332 (1980). However, our review of the record, in the light of the circumstances of this case, requires us to conclude that the decision of the Commission accepting the study as reasonable should not be reversed.

## C.

■ The league and Comptel also assail the adoption of the Staff study on two bases: the failure to allocate loop circuit investments to residential users; and the incorrect assumption that noncontinuous property extension (NCP) loops were all routed through Mountain Bell central offices. While acknowledging the failure to allocate, the Commission held that such failure had no appreciable effect on the validity of the study, since the effects of the error on the study were unimportant.

The Commission concluded that the incorrect assumption involving NCP loops was insignificant based on cost studies performed by Mountain Bell's expert Dallas Elder. We believe that the Commission's findings are supported by substantial evidence and therefore reject the League's and Comptel's challenge to the Commission's decision to employ the Staff study.

## VI.

■ Even if the Staff study is accepted as reasonable, however, the League and Comptel argue that it only provided guidance in thirteen general categories, and supplied no basis for the specific intra-category rates proposed by Mountain Bell and approved by the Commission. It appears from the record that Mountain Bell's studies arrived at costs and price changes in line with those in the general areas covered by the Staff study which the Commission had already found reasonable. We conclude that the decision of the Commission is supported by substantial evidence in the record.

We do not understand the appellants to take the position that there was no evidence adduced by Mountain Bell in the record to support the large number of individual pricing proposals. Rather, appellants apparently contend that any evidence

in the record tending to support Mountain Bell's specific proposed tariffs was rejected by the Commission when it rejected Mountain Bell's two cost-of-service studies. We do not read the Commission's decision this broadly. The cost-of-service studies submitted by Mountain Bell were rejected by the Commission because of the theoretical methods employed and not because of their results. When the results of Mountain Bell's studies were tallied with the Staff's study, the Commission found acceptance of most of the intra-category rates reasonable.

We said in *Mountain States Telephone & Telegraph Co. v. Public Utilities Commission*, 182 Colo. 269, 279–80, 513 P.2d 721, 726 (1973):

It is of significance here to also observe that rate fixing involves more than finding of facts and applying them. It involves also to a considerable extent many questions of judgment or discretion on the part of the PUC. Public utility rate making is a legislative matter, and to the PUC, under our statutory scheme, has been delegated this task. It is true, of course, that in pursuing this task, the PUC must have before it evidence on the subject matter, but the determination as to what is a fair, just and reasonable rate is a matter of judgment or discretion. This judgment or discretion on the part of the PUC must be based on evidentiary facts, calculations, known factors, relationship between known factors, and adjustments which may affect the relationship between known factors.

We believe that, considering the complexity of the task, the Commission competently exercised its expertise in this case. Accordingly, we decline to hold that the Commission acted arbitrarily or capriciously in setting the individual rates in the way it did.

## VII.

█ The Consumer Counsel also contends that, even accepting the method in which the majority of the rates were set, Touch Tone and custom calling services were priced below cost in a manner inconsistent with the principle of cost-based pricing. In particular, the non-recurring (or one time) charges were set below Mountain Bell's cost. The principle of cost-based pricing dictates that a public utility's rates be set by first determining the cost of a service and then adding to that a reasonable rate of return for the utility. The Commission indicated in the original decision that while they "favor[ ] cost-based pricing, we recognize that at times externalities will require some deviation from a strictly cost-based pricing method in order that the rates are just and reasonable."

Apparently accepting the Consumer Counsel's premise, the Commission nevertheless approved the Touch Tone and custom calling services rates, stating, "We were convinced by Mountain Bell that contribution from recurring charges will more than offset the lower revenues from non-recurring charges." We conclude that this finding is supported by substantial evidence in the record. The Consumer Counsel, however, takes the argument one step further. In the decision, the Commission rejected Mountain Bell's proposal to set non-recurring residential charges below cost because it believed that other residential users should not subsidize new customers through higher monthly bills for recurring charges. The Consumer Counsel alleges that this treatment of residential customers is inconsistent with the Commission's decision to let recurring charges for Touch Tone and custom calling services subsidize non-recurring charges.

We do not believe that this is a fatal inconsistency, however. As Mountain Bell points out, it has a statutory monopoly for providing local exchange residential service, and the Commission found that Mountain Bell was not subject to any meaningful competition in that market. On the other hand, the Commission found that "[c]ertain central office services are also candidates for transition treatment [from monopoly to

competition], particularly where they face competition from increasingly sophisticated on-premise equipment which is available in the unregulated market to many customers." In view of these differences in market "externalities" the Commission was, therefore, not required to price Touch Tone and custom calling services in precisely the same manner as residential service.

### VIII.

■ Finally, the Consumer Counsel claims that the Commission's decision to reduce the rates charged for private branch exchange (PBX) trunk lines to the rates charged for regular business lines was made solely in the interest of administrative convenience and was unsupported by substantial evidence in the record.

The Commission stated:

Mountain Bell did demonstrate during the hearings the developments in CPE [customer premises equipment] made it technologically impractical to monitor whether or not a particular line customer (due to his own sophisticated equipment) was actually using his line as a *de facto* trunk. In other words, because of technological advances, the distinctions between line charges and trunk charges have become practically obsolete, and we find that Mountain Bell's proposal to realign these two rate elements is proper, at this time.

Apparently, early types of PBX devices needed to be interconnected with Mountain Bell's public switched network using specially conditioned lines that increased their cost and justified the higher charges for the service than normal business lines. Technological developments have now made it possible for a business customer to perform PBX functions with his own equipment over normal business lines. The Commission concluded, based on testimony during the hearings, that these developments made the distinction between PBX and regular business lines obsolete, and the disparity in charges artificial. In addition,

the Commission found that it was practically impossible for Mountain Bell to determine if a particular business line was being used as a de facto trunk line. Taken together, these findings, which are supported by substantial evidence in the record, justify the Commission's decision to realign PBX and business line charges.

### IX.

We therefore conclude, as did the district court, that the Commission's decisions are supported by substantial evidence in the record and are not arbitrary and capricious. Accordingly, we affirm the judgment of the district court.

ROVIRA, J., does not participate.

MULLARKEY, J., dissents, and QUINN, C.J., joins in the dissent.

Justice MULLARKEY dissenting:

I respectfully dissent. The Office of Consumer Counsel has raised significant questions which were not addressed by the Public Utilities Commission and which seriously undercut the validity of the staff study. Because the staff study formed the primary evidentiary support for the Commission's decision adopting the rate restructuring, I would find that the Commission's approval of the rate restructuring plan was not supported by substantial evidence.

It is important to put this case in context. As the majority notes, this is the Commission's first attempt to restructure telephone rates since the 1984 break up of AT & T. Mountain Bell's entitlement to a rate increase of $21 million is not at issue. What is at issue is who will pay for the increase. More specifically, this case decides what rates will be charged for what types of services.

The rate structure system traditionally has been intended to further the goal of universal telephone service. *Mountain States Tel. & Tel. v. Public Utils. Comm'n*, 763 P.2d 1020, 1023 (Colo.1988);

§ 40–15–110, 17 C.R.S. (1984) (general assembly declares that public policy of state is to allow competitive entry of providers of telecommunications service in the intrastate market as soon as practicable consistent with the continued availability of universal telephone service). To that end, other sources of revenue such as yellow pages advertising have been used to subsidize residential service. *Mountain States*, 763 P.2d at 1023. In this decision, however, the Commission adopts cost-based rates for services. This is a significant departure from past practices and results in a dramatic increase in the cost of basic exchange services. It is no exaggeration to say that the Commission has effected a fundamental shift in the burden of paying for the costs of telephone service in Colorado. Although the Commission-authorized increase of more than $40 million in charges for basic exchange services as well as the corresponding decrease in intraLATA charges of more than $26 million may be justified, I do not believe that the record in this case was adequate to support such a major revision in the telephone rate structure. Accordingly, I would reverse and remand for a new hearing.

The Commission rejected completely the justification put forward by Mountain Bell in support of its rate restructuring plan. Mountain Bell argued to the Commission that the rate restructuring proposal was necessary in light of the dynamic changes in the telecommunications industry caused by federal deregulation and rapid technological advancements, both of which have contributed to increased competition among telecommunication service providers. However, the Commission found that "Mountain Bell has not met its burden of proof to establish that sufficient competition exists in the major markets to justify its pricing proposals." The Commission acknowledged that Mountain Bell sponsored testimony and offered exhibits including studies indicating the extent of the increased competition which the company faced but the Commission rejected this evidence, stating that "[w]e find that each of the studies was riddled with extensive flaws and does not show what it purports to demonstrate...." Finally, the Commission stated that it agreed "that access charges should be lowered, but not because of the competitive threat of bypass as alleged by Mountain Bell."

Although the Commission rejected Mountain Bell's proferred justification for the rate restructuring, it nonetheless agreed that Mountain Bell's rate restructuring proposals by and large were appropriate in light of the Commission staff's cost of service study and the Commission's support for "cost-based" pricing.[1] Thus it is clear that the staff's cost of service study was the primary if not the sole basis for the Commission's decision adopting most of the rate restructuring plan proposed by Mountain Bell.

The Consumer Counsel introduced expert testimony challenging certain methodologies used by the staff in its study. This testimony cast doubt on the reliability of the study as the basis for the Commission's adoption of the rates in this case. The Consumer Counsel presented testimony, corroborated by Mountain Bell's witnesses, that the method by which the staff allocated access costs between local services and toll-related services, the so-called subscriber plan factor (SPF), led to an allocation which was arbitrary and capricious in that it did not reflect true cost causation. If this testimony were believed, it would destroy the Commission's purported preference for cost-based rate charges. The Consumer Counsel's expert testimony indicated that the SPF approach to cost assessment was developed as a result of political compromise in order to allocate costs between

---

1. The Commission rejected the "oft-repeated contention of Mountain Bell and AT & T Comm that toll rates subsidize basic exchange rates." At the same time, the Commission affirmed its support for "cost-based" pricing. I find these two positions inconsistent. If neither local access nor long distance charges subsidized each other prior to the rate change, then the $26 million shift from toll charges to local access charges ordered by the Commission in this case apparently results in a new subsidy, i.e., local access charges subsidizing long distance charges.

interstate and intrastate telephone use and was not a suitable basis for determining intrastate rates. The Consumer Counsel presented testimony criticizing several other important aspects of the staff study with respect to the assignment of costs to local services. *See* maj. op. at 1096–97.

The majority is correct to recognize that in determining whether the Commission's decision is supported by substantial evidence, the court must view the evidence in the record in a light most favorable to the Commission. However, even though the findings of the Commission need not take any particular form, the Commission should make findings to show which of the conflicting evidence it accepts as competent and worthy of belief and which of the evidence it rejects. *Aspen Airways, Inc. v. Public Utils. Comm'n*, 169 Colo. 56, 453 P.2d 789 (1969). Such findings were not made in this case with respect to the evidence offered by the Consumer Counsel to challenge the validity of the staff report.

This is not to suggest that the Commission must address every objection raised by a party or all testimony offered at a hearing no matter how trivial or incidental to the issue under consideration. However, here the evidence offered by the Consumer Counsel was not trivial but went to the heart of the issue. It challenged the validity of the staff study, which was the evidence upon which the Commission relied in largely adopting Mountain Bell's rate restructuring plan. Thus, this court cannot engage in meaningful judicial review without knowing that the Consumer Counsel's evidence was considered and the Commission's reasons for rejecting it. In this major rate restructuring case, which effected such a fundamental shift in the burden of paying for the common costs of telephone access, it is especially critical that this court require the Commission to properly explain its decision. For the foregoing reasons, I respectfully dissent.

QUINN, C.J., joins in this dissent.

