2012 CO 33

**COLORADO OFFICE OF CONSUMER COUNSEL, Petitioner–Appellee**

v.

**COLORADO PUBLIC UTILITIES COMMISSION; Joshua Epel, in his official capacity as Chairman of the Colorado Public Utilities Commission; and James K. Tarpey and Matt Baker, in their official capacity as members of the Colorado Public Utilities Commission; Respondents–Appellants**

and

**Qwest Corporation, Intervenor–Appellant.**

**No. 11SA115.**

Supreme Court of Colorado, En Banc.

April 30, 2012.

John W. Suthers, Attorney General, Gregory E. Bunker, Senior Assistant Attorney General, Denver, Colorado, Attorneys for Petitioner–Appellee.

John W. Suthers, Attorney General, David A. Beckett, First Assistant Attorney General, Denver, Colorado, Attorneys for Respondents–Appellants.

Reilly Pozner LLP, Sean Connelly, Dufford & Brown, P.C., Richard L. Corbetta, Qwest Corporation, Timothy J. Goodwin,

Corporate Counsel, Denver, Colorado, Attorneys for Intervenor–Appellant.

Justice RICE delivered the Opinion of the Court.

¶1 Qwest Corporation and the Colorado Public Utilities Commission (PUC) appeal the district court's judgment in favor of the Colorado Office of Consumer Counsel (OCC) reversing the PUC's decision setting the maximum rate for certain telephone services. We conclude that the PUC regularly pursued its authority because it considered all of the statutorily-mandated factors and its decision is supported by substantial evidence. We therefore reverse the judgment of the district court.

## I. Facts and Procedural History

¶2 Before 2008, the rate for basic local exchange telephone service was capped pursuant to section 40–15–502(3)(b)(I), C.R.S. (2007), at a maximum of $14.88 per month, which was the maximum rate in place in 1995. In 2008, the General Assembly amended the statute to allow the PUC to set a maximum price for this service. Ch. 384, sec. 27, § 40–15–502(3)(b)(I), 2008 Colo. Sess. Laws 1791, 1805. Qwest then petitioned the PUC to set the maximum rate for basic local exchange telephone service at $18.25 per month. These rates are for flat-rate basic local telephone calling. Qwest also requested increases to the rates for message and measured services, which are basic local telephone services which charge based on the number of telephone calls placed and the number of minutes used.

¶3 At a hearing on the matter, Qwest presented evidence, based upon data from the Federal Communications Commission (FCC), that the nationwide average price for comparable service had risen by 11 percent since 1995. Qwest also called an expert who testified, based on data from a "loop" study conducted by the National Exchange Carrier Association (NECA), that costs for telephone carriers to provide comparable services had risen by 34 percent since 1995. The expert explained that a "loop" is the physical wire connection between a customer and a central office and that the NECA study indicated that the cost of serving each loop had increased by 34 percent. Evidence also showed that Qwest's labor costs had increased dramatically since 1995.

¶4 The OCC asserted that the NECA data was unreliable because it included only the loop cost, which is one of many components required to provide basic local telephone service. Also, it asserted that each loop provided other services in addition to basic telephone service and thus the cost increases of the loop were not tied directly to cost increases in basic telephone services. Finally, certain evidence indicated that actual costs of the loops as a whole grew only by a small percentage and that the loss of telephone lines contributed greatly to the 34 percent figure. That is, as the provider lost telephone line subscribers, the total cost of all loops was borne by the fewer remaining subscribed loops. Therefore, Qwest's total loop cost did not increase as dramatically as the NECA data indicated.

¶5 The parties appear to have proceeded under the assumption that the maximum rate would be set high enough so that the actual rate charged could fluctuate underneath the cap. The parties presented testimony and argument on whether the PUC should allow Qwest to implement a flexible tariff system, whereby it could change the actual rate charged without further proceedings before the PUC.

¶6 In a written order, the PUC set the maximum rate for flat-rate service at $16.52 per month for one year and at $17.00 thereafter. It also determined that measured and message maximum rates would increase by the same proportion as flat-rate service and ordered Qwest to file a compliance filing to determine the specific rates to be charged for those services. The PUC found, based upon the FCC data, that the nationwide average price for comparable service had risen by 11 percent. It rejected Qwest's assertion that costs had risen by 34 percent based on the NECA data, but found that costs for the telephone services "may have risen more quickly than the FCC price data." In order to avoid "potential rate shock" for current customers, the PUC increased the maximum rate in the first year by 11 percent, from

$14.88 to $16.52, in accordance with its finding on nationwide average price. It then increased the maximum rate in later years by another 2.9 percent, to $17.00, based upon its finding that costs had increased by more than 11 percent during the relevant timeframe. The PUC also decided that Qwest must initiate additional proceedings in order to determine the actual rate charged.

¶ 7 The OCC sought review of the PUC's decision in the district court pursuant to section 40–6–115, C.R.S. (2011). The district court reversed. It determined that the PUC set the first year maximum rate without considering two of the three statutorily-mandated factors because the PUC's written order failed to provide specific factual findings on the evidence in connection with those factors. It also determined that the increase in the later-year maximum rate was not supported by specific findings of fact on whether costs had increased and by how much. Finally, the district court held that the PUC failed to make any factual findings regarding the increase in maximum rates to measured and message services. Based upon these deficiencies, the district court concluded that the PUC did not regularly pursue its authority, that its decision was not just and reasonable, and that the decision was not supported by substantial evidence.

¶ 8 Qwest and the PUC appealed to this Court pursuant to section 40–6–115(5). We reverse the judgment of the district court.

## II. Standard of Review

¶ 9 We review a PUC decision to determine "whether the [PUC] has regularly pursued its authority." § 40–6–115(3); see Pub. Serv. Co. of Colo. v. Trigen–Nations Energy Co., 982 P.2d 316, 322 (Colo.1999). This determination includes consideration of "whether the decision of the [PUC] is just and reasonable and whether its conclusions are in accordance with the evidence." § 40–6–115(3); see Trigen–Nations, 982 P.2d at 322. This standard of review is the same as the standard for the district court. OCC·v. PUC, 786 P.2d 1086, 1091 (Colo.1990). We therefore owe no deference to the district court's decision. See id. at 1091–98. We review de novo questions of law, but defer to

the PUC's determination of factual issues. Eddie's Leaf Spring Shop & Towing LLC v. PUC, 218 P.3d 326, 330 (Colo.2009).

¶ 10 A reviewing court may not substitute its judgment for that of the PUC when substantial evidence exists to support the PUC's decision. City of Fort Morgan v. PUC, 159 P.3d 87, 92 (Colo.2007); Trigen–Nations, 982 P.2d at 322. In determining whether the decision is supported by substantial evidence, a court must view the record evidence in the light most favorable to the PUC and defer to its findings and conclusions. OCC, 786 P.2d at 1091. The PUC's findings need not be in any particular form and may be express or implied from other facts. Id. The PUC must merely make a finding sufficient to show a reviewing court which of the evidence it accepts as competent and worthy of belief and which of the evidence it rejects. Aspen Airways, Inc. v. PUC, 169 Colo. 56, 62, 453 P.2d 789, 792 (1969).

## III. Analysis

¶ 11 We conclude that the PUC considered all of the statutorily-mandated factors in determining the appropriate maximum rate for flat-rate basic local telephone service. We also hold that substantial evidence supports the PUC's decision setting the rates for flat-rate, measured, and message services. Finally, we conclude that the PUC properly applied the statutory directive regarding consideration of the changes in nationwide average prices.

¶ 12 Section 40–15–502, C.R.S. (2011), authorizes the PUC to set maximum rates as follows:

Consistent with the public interest goal of maintaining affordable and just and reasonably priced basic local telecommunications service for all citizens of the state, the commission shall structure telecommunications regulation to achieve a transition to a fully competitive telecommunications market with the policy that prices for residential basic local exchange service, including zone charges, if any, do not rise above the levels determined by the commission.

§ 40–15–502(3)(b)(I). In determining the appropriate maximum price, the PUC:

(A) Shall consider the changes since May 24, 1995, in the costs of providing such service;

(B) Shall consider the changes since May 24, 1995, in the *nationwide average price* for comparable service;

(C) Shall consider *flexible-pricing tariff options;* and

(D) May, for any affected provider, consider the net revenues derived from [certain] other services.

§ 40–15–502(3)(b)(I.5) (emphasis added).

### A. Flat–Rate Service

¶ 13 The district court determined that the PUC's findings of fact regarding costs and flexible-pricing tariff options were so deficient that the PUC failed to consider these two statutorily-mandated factors in setting the maximum rate for flat-rate basic local telephone service.[1] We disagree.

¶ 14 The PUC heard substantial testimony on the subject of costs and determined that costs had increased, but not by as much as Qwest claimed they had increased. The PUC found specific deficiencies in the NECA data: the data did not include certain other costs of providing the basic local telephone service; the data included the cost of providing other services, such as DSL internet service; and the data was affected by line loss in addition to overall escalating costs. Taking these deficiencies into account, the PUC still believed that increases in costs outstripped the 11 percent increase in the national average price. It therefore set the maximum rate beginning in the second year at approximately 14 percent greater than the 1995 rate.[2] Based on this reasoning in the PUC's decision, the PUC clearly considered costs in setting the maximum rate.

¶ 15 In addition, the PUC considered and rejected Qwest's proposal for flexible tariffs. Qwest requested that the PUC set a ceiling rate and allow it to change rates at any time without further proceedings before the PUC. The PUC declined and instead required that Qwest file an advice letter if it wished to change rates in the future. The PUC therefore considered flexible tariff options in determining the maximum rate: it rejected Qwest's request for flexible tariffs, but set a maximum rate that would allow for rate changes upon compliance with the PUC's procedural requirements. The PUC thus regularly pursued its authority by complying with the statutory mandate to consider costs and flexible-pricing tariff options.

¶ 16 Moreover, substantial evidence supports the PUC's decision to increase rates by approximately 14 percent. Taken as a whole and in the light most favorable to the PUC, the FCC report is substantial and sufficient evidence to support an increase of 11 percent. Also, although the PUC found imperfections in the NECA data, it was not required to adopt wholesale Qwest's conclusion based upon the data. *See CF&I Steel, L.P. v. PUC*, 949 P.2d 577, 586–87 (Colo.1997) (stressing that the PUC need not adopt the position of either party, but rather must exercise reasoned judgment in setting rates). Rather, the PUC may set rates based on the evidence as a whole. *Id.* Moreover, "ratemaking is not an exact science," *id.* at 586, and the PUC need not base its decision on specific empirical support in the form of a study or data, *id.* at 587. Having found imperfections in data that supported Qwest's contention that costs had risen by 34 percent, we cannot conclude that the PUC was unreasonable in its judgment that costs had risen by at least 14 percent. To the contrary, viewed in the light most favorable to the PUC, the increase in total cost of serving the

---

1. The district court also determined that, because of these fact-finding deficiencies, the PUC improperly shifted the burden of proof, violated article XXV of the Colorado Constitution, and violated the legislative mandate to set "just and reasonable" rates pursuant to section 40–3–101(1), C.R.S. (2011). Our decision upholding the PUC's determination necessarily compels reversal of these holdings as well.

2. The OCC does not contend that the PUC erred by choosing a lower first-year maximum rate to prevent "rate shock" for current customers and we believe this action is in accordance with the statute's stated "goal of maintaining affordable and just and reasonably priced basic local telecommunications service for all citizens of the state." § 40–15–502(3)(b)(I).

loops coupled with evidence of an increase in labor costs constitute substantial evidence to support the PUC's determination that costs had risen by at least 14 percent since 1995. We therefore conclude that the PUC regularly pursued its authority in setting the maximum rates for flat-rate basic local telephone service.

### B. Measured and Message Services

 ¶ 17 The district court also determined that the PUC failed to make any findings of fact justifying its decision to increase measured and message services by the same proportion as flat-rate service. But the record reveals that flat-rate, measured, and message basic local telephone services are identical services with three different methods of billing. The costs evidence described above therefore applies equally to measured and message services. Accordingly, substantial evidence supports the PUC's decision to increase measured and message service maximum rates by approximately 14 percent and the PUC regularly pursued its authority in setting these rates.

### C. Average Price Determination

■ ¶ 18 Although the district court did not reach this issue, the OCC apparently requests that this Court uphold the district court's judgment on the alternative ground that the PUC incorrectly applied the statutory directive regarding consideration of the changes in nationwide average prices.[3] We conclude that the PUC correctly applied the statute.

■ ¶ 19 When interpreting a statute, we look first to the statute's plain language, giving the language its commonly accepted and understood meaning. *Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo.2010). Section 40–15–502(3)(b)(I.5)(B) requires the PUC to "consider the changes since May 24, 1995, in the nationwide average price for comparable service." The OCC

contends that this statute requires the PUC to set the maximum rate equal to the actual nationwide average price of comparable service. But the plain language of the statute requires the PUC to consider *the changes* in the nationwide average price since 1995. The PUC therefore did not err by setting the maximum rate in accordance with an 11 percent increase to the actual 1995 rate of $14.88.

### IV. Conclusion

¶ 20 We conclude that the PUC regularly pursued its authority in setting the maximum rate for basic local telephone services because it considered all of the statutorily-mandated factors and substantial evidence supports its decision. We therefore reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

Chief Justice BENDER and Justice MÁRQUEZ do not participate.

**M.T., Petitioner–Appellee,**

v.

---

**3.** The OCC also appears to request that we uphold the district court's judgment because, it asserts, the PUC erred by considering the consumer price index and competition in the market. We do not address these arguments because the OCC did not raise them in the district court.

*See People v. Salazar*, 964 P.2d 502, 507 (Colo. 1998) ("It is axiomatic that issues not raised in or decided by a lower court will not be addressed for the first time on appeal.")

