The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Petitioner–Appellant,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO, the City and County of Denver, the Denver & Rio Grande Western Railroad Company, the Burlington Northern Railroad Company, the City of Arvada, the City of Colorado Springs, State Department of Highways—State of Colorado, the Union Pacific Railroad and the City of Westminster, Respondents–Appellees.

No. 87SA102.

Supreme Court of Colorado, En Banc.

Oct. 31, 1988.
Rehearing Denied Nov. 28, 1988.

Grant, McHendrie, Haines & Crouse, Peter J. Crouse, Denver, for petitioner-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Denver, for respondent-appellee Public Utilities Com'n.

Stephen H. Kaplan, City Atty., John L. Stoffel, Jr. Asst. City Atty. Denver, for respondent-appellee City and County of Denver.

VOLLACK, Justice.

The Atchison, Topeka and Santa Fe Railway Company (Santa Fe) appeals the order of the Denver District Court affirming the decision of the Public Utilities Commission (Commission) to impose upon Santa Fe a fee of $572,000 as its share of the cost of rebuilding the 8th Avenue viaduct (viaduct). Santa Fe argues that the Commission failed to comply with the statutory requirements of section 40–4–106(3)(c), 17 C.R.S. (1984), and based its decision to impose costs not upon evidence in the record, but upon an "assumption" concerning the amount of benefit that Santa Fe and Burlington Northern Railway Company (Burlington), the affected railroads, and the City and County of Denver (Denver) re-

ceived from construction of the viaduct. We affirm the order of the district court.

## I.

The viaduct was constructed in 1936 to serve east-west pedestrian and motor traffic between Vallejo and Mariposa streets. The two-lane viaduct provided a separate grade crossing above railroad tracks and facilities owned by Santa Fe, Burlington, and the Denver and Rio Grande Railway Co. (Rio Grande).[1] The viaduct was condemned in November 1983, and traffic was rerouted primarily to the 6th Avenue viaduct. On December 31, 1983, Denver applied to the Commission for authority to demolish and rebuild the viaduct. Santa Fe, Burlington, and Rio Grande were granted permission to intervene in the application proceedings, and hearings were held in January 1984.[2]

On February 7, 1984, the Commission granted Denver's application for permission to rebuild the viaduct, and assessed costs of $572,000 against Santa Fe based on the recommendation of John Baier, the Commission's transportation engineer. After exhausting its administrative remedies, Santa Fe appealed the Commission's decision to the Denver District Court. The district court affirmed the decision of the Commission on February 17, 1987, and Santa Fe appealed to this court pursuant to section 40–6–115(5), 17 C.R.S. (1984).

## II.

The January 1984 hearings were the first to be conducted pursuant to House Bill No. 1569, codified as subsections (3)(b) and (3)(c) of section 40–4–106. These subsections were approved June 10, 1983, and made effective July 1, 1983. Ch. 453, § 1, § 40–4–106, 1983 Colo.Sess.Laws 1558, 1558–60. Section 40–4–106 governs rules for public safety, crossings, and allocation of expenses. Subsection (3)(b)[3] describes procedures for processing applications for grade separation construction projects. Subsection (3)(c)[4] describes the method of

---

1. The two tracks in question are north-south tracks located on Burlington property. Burlington owns the southbound main track and Santa Fe owns the northbound main track. The Burlington property is located on the westernmost edge of the viaduct. The easternmost property is owned by Rio Grande, which operates switching tracks and other tracks at their facility.

2. The Commission consolidated Denver's application with applications for grade separation construction projects involving railroads and the cities of Arvada, Colorado Springs, Julesburg, and Westminster.

3. Section 40–4–106(3)(b) provides:

   Prior to January 1 of each year the commission shall take applications for grade separation construction projects and shall hold hearings, of which all parties in interest including the owners of affected property located within a one-mile radius shall have due notice, to determine which projects shall be constructed and to allocate the expenses of construction between the railroad corporations affected and between the corporation and the state, county, municipality, or public authority in interest. Only those grade separation construction projects which meet minimum criteria warranting grade separations, as adopted by the public utilities commission giving consideration to the standards utilized by the Colorado highway commission, shall be authorized for construction prior to March 1 of each year pursuant to this paragraph (b). In

its selection the commission shall consider traffic, safety, and geographic distribution.

4. Section 40–4–106(3)(c) provides:

   (I) In the allocation of expenses for each grade separation construction project pursuant to paragraph (b) of this subsection (3) between the affected class I railroad corporations and the state, county, municipality, or public authority in interest, the commission shall give equal weight to the benefits, if any, which accrue from the grade separation project and the responsibility for the need, if any, for such project.

   (II) In the allocation of the class I railroad corporations' share of expenses for a grade separation construction project pursuant to paragraphs (a) and (b) of this subsection (3), the commission shall consider the benefits, if any, which shall accrue between the class I railroad corporations affected.

   (III) The commission shall allocate such expenses among all affected class I railroad corporations up to a total of five million dollars during the twelve months beginning July 1, 1983, and up to five million dollars per year for each succeeding year. Total allocations to each class I railroad shall not exceed one million two hundred fifty thousand dollars in any one year, or six million two hundred fifty thousand dollars in any five-year period. Nothing in this subparagraph (III) shall preclude any class I railroad corporations [sic] from voluntarily contributing more than its

allocating cost of such projects between one or more class I railroads [5] and the public authority in interest. Subsection (3)(c)(I) requires the Commission to examine the railroads and public authorities affected by a proposed construction project, and to "give equal weight to the benefits, if any, which accrue from the grade separation project and the responsibility for the need, if any, for such project." Subsection (3)(c)(II) describes the method of allocating cost between two or more class I railroads. It requires the Commission to consider the relative benefits, if any, that each railroad receives from the project. Neither subsection (3)(b) nor subsection (3)(c), however, prescribes a particular method of measuring these benefits and responsibilities.

John Baier, the Commission's transportation engineer, developed a new methodology in an attempt to comply with section 40-4-106. He provided written and oral testimony about his "base case method" at the January 1984 Commission hearings. The base case method is a three step process. First, a theoretical model is created to simulate typical traffic patterns. Second, the base case is compared to the actual project. Deviations from the base case are then analyzed "on a component basis addressing the question of benefit and responsibility for need." Third, costs for each component are allocated among the respective parties based on this comparison of the actual project to the base case.

In this base case, Baier assumed that one public authority desired to build a road that intersected one set of railroad tracks. He stated that the road could be built on

ground level or "at-grade," above grade by means of a viaduct or overpass, or below grade by means of a tunnel or underpass. He then compared the benefits the public authority and the railroad receive from construction of an above grade road to the benefits received from construction of an at-grade railroad crossing. He observed that construction of a grade separation construction project was mutually beneficial to the public authority and the railroad because it eliminated any chance of collisions between trains and road traffic, disruption of train or traffic patterns, release of hazardous materials, and delay of emergency road vehicles. The railroad received additional benefits from construction of an above grade road, said Baier, including eliminating the possibility of damage to switches, tracks and equipment; decreasing the possibility of train delay or derailment; avoiding cost of installing and maintaining at-grade safety devices; and maintaining the railroad's "freedom of operation." [6] He stated: "It is extremely difficult to measure and quantify these benefits [to the railroad and the public authority]. However, the benefits are shared equally."

Baier then weighed the responsibility that the railroad and the public authority had for the need for construction of a grade separation construction project. He surmised that a grade separation construction project "would not be required if either the railroad or the roadway did not occupy the same right of way." Accordingly, he concluded that in the base case the railroad and the public authority bore equal responsibility for the need for con-

---

allocated share for grade separation construction in one year; and in such event, all amounts contributed by such railroad exceeding its allotted share in any year shall be credited to and shall serve to reduce any allocation for grade separation construction expenses to that railroad in subsequent years. Nothing in this subparagraph (III) shall be construed to authorize less than twenty-five million dollars to be assessed against all affected class I railroad corporations in any five-year period.

Subsections (3)(b) and (3)(c) were originally designed to become inoperable on June 30, 1988. Effective April 21, 1986, however, these subsections were repealed and reenacted with

amendments. Ch. 251, § 1, § 40-4-106, 1986 Colo.Sess.Laws 1157, 1157-58. As a result, these amended subsections remain in effect. *See* § 40-4-106, 17 C.R.S. (1987 Supp.).

**5.** There are four class I railroad corporations operating in Colorado. They are the Atchison, Topeka and Santa Fe Railway Company, the Burlington Northern Railroad Company, the Denver and Rio Grande Western Railroad Company, and the Union Pacific Railroad Company.

**6.** Baier defined "freedom of operation" to include the ability of the railroad to raise or lower speed limits for the trains and to move crossing and switching operations.

struction of the project. As a result, he concluded that, under subsection (3)(c)(I), the railroad and the public authority received equal benefit from and bore equal responsibility for removing and replacing the viaduct.

In measuring the benefit under subsection (3)(c)(II) that each railroad derived from construction of the viaduct, Baier divided the viaduct into two components: the eastern component, which crossed the airspace above land owned by Rio Grande; and the western component, which crossed the airspace above tracks owned by Santa Fe and Burlington. He calculated that the cost of constructing the western component of a basic grade separated viaduct was $2,288,013.[7] Of that amount, Baier recommended that half should be paid by Denver, while the other half should be paid equally by Santa Fe and Burlington, because each railroad owned one track. He placed no weight on the number of trains each railroad operated or to the revenue generated from each track. Santa Fe's share of the cost of building the viaduct was calculated to be 25% of the cost of building the western component of the viaduct, or $572,000.[8]

### III.

■ Review of the Commission's decisions is limited to three concerns: whether the Commission has regularly pursued its authority; whether its decisions are just and reasonable; and whether its conclusions are in accordance with the evidence. § 40–6–115(3), 17 C.R.S. (1984); *see also Colorado Office of Consumer Counsel v.*

*Public Util. Comm'n,* 752 P.2d 1049, 1057 (Colo.1988); *RAM Broadcasting of Colorado, Inc. v. Public Util. Comm'n,* 702 P.2d 746, 750 (Colo.1985). Orders of the Commission are presumed to be reasonable and valid, *Caldwell v. Public Util. Comm'n,* 200 Colo. 134, 137, 613 P.2d 328, 330 (1980), and the party challenging an order bears the burden of showing its impropriety, *Public Util. Comm'n v. Weicker Transp. Co.,* 102 Colo. 211, 217, 78 P.2d 633, 636 (1938).

■ Factual determinations of the Commission are entitled to considerable deference. *G & G Trucking Co. v. Public Util. Comm'n,* 745 P.2d 211, 216 (Colo. 1987). A reviewing court must view the evidence in the light most favorable to the Commission. *Peoples Natural Gas Div. v. Public Util. Comm'n,* 193 Colo. 421, 427, 567 P.2d 377, 381 (1977). It may not disturb those factual determinations that are supported by substantial evidence in the record. *Acme Delivery Serv. v. Cargo Freight Sys.,* 704 P.2d 839 (Colo.1985). Nor may a reviewing court substitute its judgment for that of the Commission. *Public Serv. Co. v. Public Util. Comm'n,* 644 P.2d 933, 940 (Colo.1982).

■ In determining whether to disturb the factual determinations of the Commission, the reviewing court must search the record for evidence favorable to the Commission, *North Eastern Motor Freight, Inc. v. Public Util. Comm'n,* 178 Colo. 433, 437, 498 P.2d 923, 925 (1972), because findings may be express or implied from a reading of the record as a whole, *see Aspen Airways, Inc. v. Public Util. Comm'n,* 169

---

7. Baier stated that the estimated cost of constructing the western component of the actual viaduct would be much greater than $2,288,013, but observed that those additional costs were not properly attributable to the affected railroads. Some of these additional costs were due to tearing down the old viaduct, building a new foundation, and repairing adjacent streets, curbs, and gutters. These costs were borne wholly by Denver.

8. Burlington's share of the cost of building the viaduct was also calculated at $572,000. That amount, however, was reduced because of Burlington's concomitant obligation to share in the cost of building grade separation projects in

Arvada and Westminster. Section 40–4–106(3)(c)(III) limits the amount a class I railroad may be required to pay for grade separation projects in any one year to $1,250,000. Because Burlington's share of the cost of building the grade separation projects in Arvada, Westminster, and Denver was calculated to be $2,234,000, which was in excess of the maximum amount Burlington could be charged under the statute, Burlington's cost of the Denver viaduct was adjusted to $310,000. Burlington agreed to pay the adjusted amount for construction of the viaduct, and is not a party to this appeal.

Colo. 56, 62, 453 P.2d 789, 792 (1969). Findings may not be set aside merely because the evidence before the Commission is conflicting or because more than one inference can be drawn from the evidence. *Morey v. Public Util. Comm'n*, 629 P.2d 1061, 1068 (Colo.1981). Finally, whether an order is supported by substantial evidence is a question of law. *Public Util. Comm'n v. Northwest Water Corp.*, 168 Colo. 154, 169–70, 451 P.2d 266, 273–74 (1969). *See generally Colorado Mun. League v. Mountain States Tel. & Tel. Co.*, 759 P.2d 40, 44 (Colo.1988). With these principles in mind, we turn to Santa Fe's claims.

### IV.

The essential question before us is whether the conclusions of John Baier, the Commission's transportation engineer, constitute substantial evidence upon which to base the Commission's findings. Santa Fe characterizes Baier's conclusions as mere assumptions, entitled to no evidentiary weight. The Commission characterizes Baier's conclusions as expert opinions entitled to substantial deference.

### A.

■ Santa Fe argues that there was insufficient evidence to support the Commission's finding that Santa Fe and Burlington received any benefit whatsoever from construction of the viaduct because an at-grade crossing was neither in place nor proposed at the time of the application. Denver argues that an at-grade crossing was considered and rejected at the time of the application, and that the benefit Santa Fe received was being relieved of burdens related to construction of an at-grade crossing.

The record reveals that the option of constructing an at-grade crossing was considered and rejected at the time of the application to rebuild the viaduct. On January 19, 1984, John Stamm, Denver's director of design and construction engineering, testified that reconstruction of the viaduct was the "best alternative in all those being considered." He testified that he would not recommend an at-grade crossing

because it "would create a great deal of conflict, possible conflict, between train movements and the vehicular, and pedestrian, and bicycle traffic." In addition, John Baier testified that the alternative of constructing an at-grade crossing is always considered when a grade separation construction project is proposed.

The Commission faced a choice of two alternatives that would permit traffic to enter and leave downtown Denver. It chose the alternative of constructing a viaduct after considering traffic, safety, and geographic distribution as required by section 40–4–106(3)(b). A reviewing court cannot substitute its judgment when the Commission selects one of two equally reasonable courses of action. *GTE Sprint Communications Corp. v. Public Util. Comm'n*, 753 P.2d 212, 218 (Colo.1988); *Contact–Colorado Springs, Inc. v. Mobile Radio Tel. Serv.*, 191 Colo. 180, 183, 551 P.2d 203, 205 (1976). By choosing the alternative of constructing a viaduct, the Commission relieved Santa Fe of the burden of installing safety devices as well as exposure to tort liability from automobile-train collisions. This is sufficient to demonstrate that Santa Fe received a benefit from rebuilding the viaduct.

### B.

Santa Fe argues that, even if it did receive a benefit from construction of the viaduct, there was no evidence to support the Commission's finding that the benefit derived by the affected railroads was equal to the benefit derived by Denver. Santa Fe raises two related arguments in support of this position. First, the Commission misapplied section 40–4–106(3)(c)(I) by assuming that benefits were shared equally, rather than separately weighing the benefits from and responsibility for the need for the viaduct. As such, claims Santa Fe, the Commission did not regularly pursue its authority. Second, the Commission failed to support its finding of equal benefits with evidence in the record. Santa Fe argues that, although the record supports a finding of equal *responsibility* for the need for the viaduct, there is insufficient evidence to

support a finding that the affected railroads and Denver *benefit* equally from construction of the viaduct. Santa Fe argues that a mere assumption that benefits are equal is no substitute for a gathering of statistical or other empirical evidence to support such a conclusion. We reject each argument in turn.

### 1.

■ The General Assembly in enacting section 40–4–106(3)(c)(I) did not prescribe a particular method of measuring the benefits that affected railroads and public authorities derive from construction of a grade separation construction project. The General Assembly merely demanded that the Commission give separate and equal weight to the benefits and responsibilities that flow to affected railroads and public authorities from construction of a project such as the viaduct. The Commission has followed the mandate of subsection (3)(c)(I) in this case by adopting the analysis and conclusions of John Baier. From a consideration of traffic, safety, and geographic distribution, Baier concluded that the factors that benefited Denver also benefited Santa Fe and the other affected railroads in the same way. Although the affected railroads received additional benefits that did not accrue to Denver, such as eliminating damage to tracks, signals, and equipment, he concluded that these difficult to quantify benefits were "shared equally." He also stated that he considered responsibility for the need for the viaduct in his base case, and concluded that the affected railroads and the public authority were equally responsible. The Commission adopted these conclusions in its findings on February 7, 1984. Because the Commission gave separate and equal weight to the benefits and responsibility that flow to Denver, Santa Fe, and Burlington from construction of the viaduct, we hold that the Commission properly construed subsection (3)(c)(I).

### 2.

■ The Commission did not gather statistical or other empirical evidence of the benefit that affected railroads and Denver received from construction of the viaduct. Neither subsection (3)(c)(I) nor the principles of administrative law, however, so limits the evidence the Commission may consider. Substantial evidence is all that is required to support a finding of the Commission. *See Colorado Mun. League v. Mountain States Tel. & Tel. Co.,* 759 P.2d 40, 44 (Colo.1988); *City of Montrose v. Public Util. Comm'n,* 629 P.2d 619, 622 (Colo.1981). In this case, substantial evidence of the benefit to the respective parties was present in the form of John Baier's expert testimony. Construing his testimony as expert opinion, we hold that the Commission did not abuse its discretion in concluding that Denver and the affected railroads benefited equally from construction of the viaduct.

### C.

■ Santa Fe argues that there was no evidence to support the Commission's finding that the benefit to Santa Fe was equal to the benefit derived by Burlington. It claims that mere ownership of railroad tracks is not a sufficient basis to support the Commission's findings that construction of the viaduct would benefit Santa Fe and Burlington equally. Santa Fe points out that, on average, Burlington trains are almost three times longer than the average Santa Fe train, and run six times as often.[9] If benefit to affected railroads under subsection (3)(c)(I) is based on elimination of hazards that arise from construction of an at-grade crossing, argues Santa Fe, then Burlington must be said to receive more benefit from construction of the viaduct than Santa Fe under subsection (3)(c)(II), because Burlington operated more trains and longer trains than Santa Fe, and would have been far more likely to encounter these hazards than Santa Fe. The Commis-

**9.** According to Santa Fe's assistant general manager of engineering, Burlington operates twenty-four daily trains, while Santa Fe operates four daily trains. Also, the average length of twenty of Burlington's twenty-four trains is 110 cars, while the average length of Santa Fe's trains is 40 cars.

sion argues that determining benefit based on ownership rather than use of the tracks is an appropriate basis of determining benefit under subsection (3)(c)(II). It points out that the Burlington trains are operated by Santa Fe crews pursuant to contract between the two railroads, and that Santa Fe is free to increase the number and length of its trains so as to offset additional costs imposed by Denver.

John Baier testified at the January 20 hearing that he rejected the idea of basing measurement of benefit to Santa Fe and Burlington on volume of train traffic or revenue generated to the railroad. He said that Santa Fe and Burlington could change the terms of their contract to adjust the payments that each railroad was assessed by the Commission. He concluded that benefit to each railroad should be based on ownership of the tracks.

While a good case can be made that benefit to each railroad should be based on the number of trains or the revenue generated to each railroad, the Commission rejected this basis in favor of basing benefit on ownership of the tracks. Because each of these solutions was reasonable, we cannot substitute our judgment for that of the Commission. The Commission's findings were based on substantial evidence in the record. We therefore conclude that the Commission did not abuse its discretion in finding that Burlington and Santa Fe received equal benefit under section 40–4–106(3)(c)(II).

The order of the district court is affirmed.

ERICKSON, J., dissents.

ROVIRA and KIRSHBAUM, JJ., join in the dissent.

ERICKSON, Justice, dissenting:

I respectfully dissent. In my view there is no competent evidence in the record before us to support the commission's conclusions that the railroads and the City and County of Denver derive equal benefits from the viaduct, and that the assessment against Santa Fe and Burlington should be equally divided.

Although a reviewing court may not substitute its judgment for that of the PUC, it must determine whether there is competent evidence in the record to support the PUC's decision. *RAM Broadcasting of Colorado, Inc. v. Public Utilities Comm'n.,* 702 P.2d 746 (Colo.1985); *Atchison, Topeka & Santa Fe Ry. Co. v. Public Utilities Comm'n,* 194 Colo. 263, 572 P.2d 138 (1977). Similarly, while the findings and conclusions of the commission are presumed to be valid, and must be reviewed in the light most favorable to the commission's decision, a PUC decision that is not supported by substantial evidence must be set aside. *Home Builders Ass'n v. Public Utilities Comm'n,* 720 P.2d 552 (Colo.1986).

Here, the commission concluded that Denver's benefits of increased traffic flow are equal to the railroads' benefits of increased speed over a surface crossing and the elimination of auto-train accidents that might occur at a grade-level crossing. However, the commission's conclusion is based entirely on expert opinion testimony, primarily that of John Baier, Staff Transportation Engineer for the PUC. Baier's testimony is comprised only of assumptions and conclusions, without any statistical data or empirical observations to support his opinions. For example, he did not provide the commission with data concerning the frequency of auto-train accidents at an at-grade crossing, with data concerning the added time the railways would save by a viaduct crossing, or with data concerning the railways' exposure to liability resulting from an at-grade crossing. In sum, Baier's "base case" methodology reaches the presumptive and unsupported conclusion that Denver and the railways benefit equally from the viaduct. Common sense dictates that the main benefit of the viaduct is better handling of traffic flow, a benefit to Denver only. Baier's testimony *assumed* equal benefits instead of attempting to actually measure, quantify or document the benefits to Denver and the railroads, and then weigh the benefits of each party against each other.

In my view, therefore, the commission acted arbitrarily when it relied on Baier's

conclusions rather than documenting and weighing the benefits to both parties as required by section 40–4–106(3)(c)(I), 17 C.R.S. (1984). The PUC's conclusion that the railways derive as much benefit from the viaduct as does Denver is not supported by substantial or competent evidence.

Further, the commission disregarded a statutory directive when it allocated the cost assessment between Burlington and Santa Fe solely on the basis of track ownership. Subsection 40–4–106(3)(c)(II), 17 C.R.S. (1984), states: "In the allocation of class I railroad corporations' share of expenses for a grade separation construction project pursuant to paragraphs (a) and (b) of this subsection (3), the commission *shall consider the benefits, if any, which shall accrue between the class I railroad corporations affected.*" (Emphasis added.)

Disregarding the plain meaning of subsection 40–4–106(3)(c)(II), Baier failed to consider the respective benefits of the viaduct which would accrue to each railroad. He gave no consideration to the number of trains each railroad operated, the length of the trains, or the amount of increase in revenues each railroad would receive as a direct result of the construction of the viaduct.[1] At the hearing, Baier admitted on cross-examination that he declined to consider the amount and volume of train traffic of each railroad and failed to consider the fact that Santa Fe only operates four trains a day under the viaduct. Again, the commission based its decision solely on Baier's recommendations.[2] In my opinion, by not considering the added benefits accruing between the two railroads affected, and by basing its decision solely on track ownership, the commission violated subsection 40–4–106(3)(c)(II). The 50% allocation of the costs to each railroad is nothing more than arbitrary and is not supported by any factual predicate.

Because I believe that the commission abused its discretion by rendering decisions unsupported by competent and substantial evidence, I would reverse and remand to the district court with directions to return the case to the Public Utilities Commission for further proceedings consistent with this opinion.

I am authorized to say that JUSTICE ROVIRA and JUSTICE KIRSHBAUM join in this dissent.

---

1. An employee of Santa Fe testified at the hearing that on the average, Burlington operates six times as many trains under the viaduct as Santa Fe. Burlington's trains are also much longer than those operated by Santa Fe. Because each railway retains the revenues and pays expenses in proportion to its wheel count, any allocation between the railways would have to recognize the dominance of Burlington's use of the tracks under the viaduct.

2. Despite undisputed evidence in the record demonstrating Burlington Northern's more frequent use of the tracks under the viaduct, the commission concluded that "[b]oth railroads are equally responsible for and will equally benefit from the construction of the proposed viaduct."