**INTEGRATED NETWORK SERVICES, INC., and Colorado Payphone Association, a Colorado nonprofit corporation, Petitioners–Appellees/Cross–Appellants,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO; and Commissioners Arnold H. Cook, Gary L. Nakarado, Christine E.M. Alvarez, Respondents–Appellants/Cross–Appellees,**

Colorado Office of Consumer Counsel; and US West Communications, Inc.; Colorado Municipal League; and the City and County of Denver, Intervenors.

No. 93SA112.

Supreme Court of Colorado, En Banc.

June 13, 1994.

Powers, Phillips, Hopfenbeck & Vincelette, P.C., Ann E. Hopfenbeck, Denver, for petitioner-appellee/cross appellant Integrated Network Services, Inc.

Robert W. Nichols, Harvey D. Flewelling, Boulder, Walters & Joyce, P.C., Craig D. Joyce, Denver, for petitioner-appellee/cross appellant Colorado Payphone Ass'n.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Anthony Marquez, First Asst. Atty. Gen., General Legal Services Section, Denver, for respondent-appellant/cross-appellee Public Utilities Com'n.

Deborah S. Waldbaum, Asst. Atty. Gen., James R. Lewis, Sr. Asst. Atty. Gen., Denver, for intervenor Colorado Office of Consumer Counsel.

US West Communications, Inc., Wendy M. Moser, Dennis R. Lopach, Roy A. Adkins, P.C., Roy A. Adkins, Denman & Associates, P.C., Steven H. Denman, Denver, for intervenor US West Communications, Inc.

Chief Justice ROVIRA delivered the Opinion of the Court.

The Public Utilities Commission of the State of Colorado (PUC) appeals the decision of the district court which set aside the PUC's decision mandating measured service rates for shared tenant service providers and for public access line service. Integrated Network Systems, Inc., (Integrated Network) and Colorado Payphone Association (Colorado Payphone) cross-appeal, claiming the district court erred in not concluding that the PUC's decision was unjust, discriminatory and anticompetitive. Colorado Payphone also cross-appeals the decision of the district court which affirmed the PUC's decision refusing to order US WEST to provide coin

lines to private payphone providers. We affirm in part and reverse in part.

## I

In September 1990, US WEST Communications, Inc. (US WEST), initiated a general rate case by filing an advice letter with the PUC.[1] The letter contained certain tariff schedules designed to increase US WEST's revenues by $70.2 million. The PUC suspended the proposed rate increases to investigate the propriety of the tariffs filed by US WEST. *See* § 40–6–111(1), 17 C.R.S. (1993). Thereafter, the PUC bifurcated the rate case into two phases. Phase I addressed the revenue requirement for US WEST and was settled through a stipulation, approved by the PUC, in which the parties agreed that US WEST was entitled to increased revenues in the amount of $32.7 million. Phase I is not at issue in this appeal.

In order to allow US WEST to satisfy its new revenue requirement, Phase II required the PUC to adopt rates for the various regulated telephone services offered by US WEST. Hearings were held before a PUC administrative law judge to determine the appropriate rate structure for the various regulated US WEST services. Subsequently, the PUC issued its initial decision in which it adopted mandatory measured service rates for shared tenant service (STS) providers and continued mandatory measured service rates for public access line (PAL) service.[2]

Integrated Network, a STS provider, and Colorado Payphone, an association representing private payphone providers that subscribe to PAL service, filed applications for reconsideration of the initial PUC decision. Both parties argued that the PUC erred in establishing the mandatory measured service rates for their respective groups. The PUC affirmed its initial order (order II). Thereafter, both Integrated Network and Colorado

Payphone appealed the PUC's decision to the Denver District Court. After consolidating the appeals, the district court set aside the decision of the PUC and remanded the case for further proceedings to determine whether a flat rate option should be offered to STS providers and for PAL service. The PUC appealed the case to this court to review the decision of the district court. In addition, Integrated Network and Colorado Payphone have both raised issues on cross-appeal.

## II

On appeal, the PUC argues that its decision to establish mandatory measured service rates for STS providers and to continue measured service rates for PAL service is supported by substantial evidence in the record, and therefore, the district court erred in setting aside the decision of the PUC. We will first examine the PUC's arguments with respect to PAL service and then with respect to STS providers.

### A

To understand and evaluate the arguments advanced with respect to the PAL service rate, it is helpful to have an understanding of the payphone industry. Public payphone service allows members of the public to make local or long distance telephone calls from public locations. Payphone service in Colorado is currently provided by US WEST and by authorized private payphone[3] providers. Like US WEST, private payphone providers offer payphone services directly to the public. Both US WEST and private payphone providers must interconnect to the local exchange telephone network in order to provide services to the public. Private payphone providers, however, must purchase such connections from US WEST by subscribing to PAL service. These providers then resell the local telephone service—purchased from US WEST—to members of the

---

1. The PUC has authority to establish rates and policies for Colorado public utilities. *See* §§ 40–1–101 to 40–7–117, 17 C.R.S. (1993).

2. In addition to ordering mandatory measured service rates for STS providers and for PAL service, the PUC adopted a number of tariffs for

various regulated US WEST services which are not in dispute.

3. Private payphones refer to those payphones owned or operated by persons or companies other than the traditional local exchange telephone companies (such as US WEST).

public who place telephone calls on the private payphones. The rate that a private payphone provider must pay to subscribe to PAL service depends upon whether the PAL service tariff is a flat rate or a measured service rate. A flat rate provides a customer with unlimited local calling for a fixed monthly charge. Under a measured service rate, however, a customer's monthly bill will vary depending upon the number and duration of all local calls made within the month. Thus, a measured service rate is usage sensitive. Measured service rates have been required for PAL service for a number of years. Indeed, the PUC approved mandatory measured rates for PAL service in 1986. *See Re Mountain States Tel. & Tel. Co.,* 73 P.U.R.4th 515 (1986).

### 1.

At the Phase II hearing, Colorado Payphone argued that PAL service should be offered the same flat rate option available to other businesses.[4] Conversely, US WEST argued the PUC should continue to impose the measured service rate for PAL service. In support of this contention, US WEST advanced two arguments. First, PAL usage is higher than the average monthly usage on a flat business line. Second, the measured service rate for PAL service is appropriate because, unlike regular businesses, PAL service is used to resell basic telephone service.

The PUC clearly rejected the usage argument, concluding "[t]he argument that PAL usage is higher than the average monthly usage on a ... business line is not supported by the record."[5] The PUC, however, found the resale argument persuasive, noting "[t]he second reason, that PAL is a resale service, has merit, and the [PUC] has determined that there should be some differential in rates based on the nature of the service." Accordingly, the PUC opted to continue the measured service rate structure for PAL ser-

vice. In approving the measured service rate, the PUC stated that the rate "provides reductions for the PAL users so that their rates are more in line with other business users, but keeps the rate as a required measured rate" and that such a rate is appropriate because it "recognizes that [PAL service] is [a] resale service."[6] In setting aside the decision of the PUC, the district court determined that the decision of the PUC was not supported by substantial evidence, and thus, was arbitrary and capricious.

### 2.

■ This case requires us to review a ratemaking decision of the PUC. Ratemaking is a legislative function, *Colorado Ute Elec. Ass'n Inc. v. Public Util. Comm'n,* 760 P.2d 627, 638 (Colo.1988), *appeal dismissed,* 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), and legislative authority in public utility matters has been delegated to the PUC. Colo. Const. art. XXV. Indeed, the PUC has broad constitutional and legislative authority to regulate public utilities in Colorado. *City of Montrose v. Public Util. Comm'n,* 629 P.2d 619, 622 (Colo.1981). Furthermore, the PUC is an administrative agency with considerable expertise in the area of utility regulation and, as such, its decisions should be accorded due deference.

■ Our review of a PUC decision is limited to whether the PUC has regularly pursued its authority, whether its decision is just and reasonable, and whether its conclusions are in accordance with the evidence. § 40-6-115(3), 17 C.R.S. (1993); *see also Colorado Mun. League v. Mountain States Tel. & Tel. Co.,* 759 P.2d 40, 44 (Colo.1988). The PUC's appeal of the district court's order relates to the last of these concerns—namely the sufficiency of the evidentiary support for its decision. Thus, we must determine whether the decision of the PUC is supported by substantial evidence in the record.

---

4. General business subscribers to US WEST's services are allowed to select a flat rate option.

5. The PUC did note that subscribers to PAL service may have different usage characteristics than a regular business line.

6. The PUC reduced the PAL service rate to conform with other measured and message business line rates and ordered uniform rates for all measured and message usage. In addition, the PUC applied time-of-day and day-of-week discounts to PAL service. Neither Integrated Network nor Colorado Payphone challenges the measured service rate adopted by the PUC.

*Douglas County Bd. of Comm'rs v. Public Util. Comm'n,* 866 P.2d 919, 926 (Colo.1994).

Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," . . . and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Colorado Mun. League v. Mountain States Tel. & Tel. Co.,* 759 P.2d 40, 44 (Colo.1988) (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)). Further, in ascertaining whether the decision is supported by substantial evidence, we must view the record in the light most favorable to the PUC. *G & G Trucking Co. v. Public Util. Comm'n,* 745 P.2d 211, 216 (Colo.1987). Nonetheless, whether a decision of the PUC is supported by substantial evidence is a question of law. *Atchison, Topeka & Santa Fe Ry. v. Public Util. Comm'n,* 763 P.2d 1037, 1042 (Colo.1988).

▄ After examining the record, we conclude that the PUC's decision to continue measured service rates for PAL subscribers is supported by substantial evidence. First, the PUC heard testimony from a number of witnesses that PAL service involves the resale of basic telephone service purchased from US WEST, and thus, is a resale service.[7] In addition, there was testimony presented that PAL service has not historically been available at a flat rate because PAL service is a resale service. There was also testimony that the PUC has previously determined that a measured service rate is appropriate for PAL service. Moreover, a US WEST witness testified that the "primary consideration" in advocating a measured service rate for PAL service is the fact that it is a resold basic exchange service and that usage alone is not the criterion for rec-

ommending a measured service rate for PAL service. Furthermore, the PUC heard testimony that if a flat rate option was offered for PAL service, then the possibility of arbitrage exists. This means that PAL subscribers could acquire usage at a low price per unit—through a fixed monthly rate—and then resell telephone services to the general public at rates and under conditions not subject to the PUC's control. There was also testimony that arbitrage in a regulated market is not in the public interest. Evidence was presented demonstrating that the private payphone business has grown during the period that mandatory measured service rates have been in effect. Finally, continuation of the measured service rate for PAL service was recommended by US WEST as well as the PUC staff. Based on this evidence, the PUC concluded that "it is not in the public interest to set a flat rate for PAL" and that the measured service rates should remain.

### 3.

Colorado Payphone argues the reseller justification is dependent upon the assumption of high usage by PAL subscribers, and since the high usage rationale is not supported by the record, there is no evidence to support measured service rates for PAL. We find this assertion unpersuasive.

First, the PUC explicitly rejected the usage rationale as a basis for its decision. In addition, there was sufficient testimony to support the fact that those who subscribe to PAL service resell telephone services to the general public. In fact, unlike other businesses that subscribe to US WEST services, the primary purpose of those who subscribe to PAL service is to provide telecommunications services to the public, and thus, to compete with US WEST. This basic difference between PAL subscribers and other business subscribers formed the basis of the PUC's decision to continue measured service rates for PAL subscribers. We have previ-

---

**7.** The PUC has defined "resale" as "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications services and facilities to the public (with or without 'adding value') for profit." *In the Matter of the Investigation of the Sale and Resale of Intrastate Communication Services Within the State of Colorado,* No. C83–1454 (Sept. 13, 1983) (not published) (quoting *American Tel. & Tel. Co. v. FCC,* 572 F.2d 17, 20 n. 4 (2d Cir.1978)).

ously recognized that there is a rational basis for treating resellers differently than a regulated entity because, unlike a regulated entity, "resellers can set their own rates and change them at will, choose the markets in which they wish to do business, and enter and leave those markets at will." *Colorado Office of Consumer Counsel v. Public Util. Comm'n,* 786 P.2d 1086, 1092 (Colo.1990).

In sum, there is substantial evidence to support the decision of the PUC to maintain mandatory measured service rates for PAL service. Accordingly, the decision of the district court is reversed.

**B**

■ We turn now to the decision of the PUC to establish mandatory measured service rates for STS providers. First, we will review the way in which STS providers operate and then determine whether there is substantial evidence to support the decision of the PUC.

US WEST has a business telecommunications service offering known as Centron Custom service. This service allows subscribers access to special calling features such as call forwarding, call transfer and conference calling. The Network Access Register (Network Access) is one component of Centron Custom service. The Network Access is software located in US WEST's central office which provides subscribers access to the local exchange network.[8]

Trunking service is provided to customers who have private branch exchanges (PBX) located on their premises. A PBX is a software program that provides switching capability and access to advanced features such as call forwarding, call transfer, and conference calling for larger business customers with many telephone users. The PBX connects the local exchange telephone company—US WEST—with PBX trunks that are shared by the numerous telephone users connected to the PBX. The PBX trunk functions like the Network Access service to give the telephone users access to the local exchange network.

US WEST offers Network Access service and PBX trunks on both an individual basis and a shared-use basis. Thus, individual businesses purchase Network Accesses and trunks directly from US WEST for their own use, or a STS provider purchases shared-use Network Access service or shared-use trunk service from US WEST and then sells this service to its customers. The cost to US WEST of providing trunk and Network Access service to individual businesses is similar to providing such services to STS providers. The difference, however, is that STS providers, such as Integrated Network, repackage local exchange service purchased from US WEST with other services (such as voice messaging and call forwarding), and provide the enhanced package to their customers. Thus, in the final analysis, the customers who purchase telephone services from a STS provider do not purchase those services directly from US WEST.

**1.**

Historically, STS providers have paid a flat rate approximately twice the flat rate paid by businesses purchasing Network Accesses and trunks for their own use directly from US WEST. At the Phase II hearing, several parties including US WEST, the PUC staff, the Office of the Consumer Counsel and AT & T advocated the adoption of a premium flat rate option for STS providers. The proposed premium flat rate was approximately twice that of the proposed nonshared flat business trunk rates. Integrated Network challenged this rate structure, arguing that STS providers should be charged rates equivalent to the rates paid by business customers purchasing trunk and Network Access service directly from US WEST for their own use. Thus, substantially all of the testimony and evidence presented at the hearing was directed to the question of whether the PUC should adopt the premium flat trunk rate.

The PUC rejected a flat rate option for STS providers and adopted a mandatory measured service rate. In so doing, the PUC noted that the costs to provide the

8. The number of Network Accesses to which a customer subscribes controls the number of simultaneous talk paths available to a customer over the local exchange network.

Network Access service and the trunk service to the two groups was the same and that the services are functionally equivalent. Nonetheless, the PUC stated:

> [T]here also is evidence that STS usage may not be the same as the usage for flat business trunks. STS providers are, in effect, much like small Local Exchange Providers since they can carry both business and residential traffic. In addition, STS providers displace residential and business lines ... and therefor displace revenues that would be received by US WEST in the provision of basic local exchange service.
>
> STS service is different from service for flat business trunks. It involves the aggregation of many users who would generally take other types of service, rather than one user that would not generally have used multiple units of another service. Functional equivalency, and similar costs are reasons for similar prices, but here the different usage, the facts that we are not dealing with end users and the loss of the provision of the other types of service to those who subscribe to the service of the STS provider justify a difference in treatment, but we believe that difference should result in the same kind of treatment as we are approving for PAL service, i.e., mandatory measured service.

The district court set aside the decision of the PUC, concluding that the PUC's decision was not supported by substantial evidence.

### 2.

Applying the substantial evidence standard of review delineated above, *see supra* pp. 1376–1377, we conclude that the PUC's decision is supported by substantial evidence.

In the course of the hearing, the PUC heard testimony from numerous witnesses that STS providers compete with US WEST in the provision of telephone service. Indeed, testimony was presented that one STS trunk can displace several US WEST business lines and that this results in displacing significant US WEST revenue.[9] Further, there was testimony that STS providers traditionally locate in high density areas where there is the potential to replace several business lines. Moreover, the PUC was informed that the only way US WEST can recover this lost revenue is to tap into the general body of ratepayers. There was also testimony that STS providers can enter both the residential and the business markets and that US WEST would have a substantial amount of vulnerability if it is forced to allow STS providers flat rate prices that do not account for this competitive risk. A US WEST witness testified that STS providers resell service purchased from the local telephone company. Further, the PUC heard testimony that the difference in rates between STS providers and other businesses was due, not to the cost of providing access to these respective groups, but to the social effects of arbitrage of US WEST's service and the potential cost to the ratepayers. Testimony was introduced that arbitrage in a regulated market is not in the public interest. In addition, several parties advocated that a difference between the flat rates charged STS providers and flat rates charged businesses is appropriate. Finally, a PUC staff member testified that though he accepted the premium flat rate advocated for STS providers, his "first alternative" was to make shared tenant a measured service rate. This recommendation was based upon the fact that STS providers have the ability to provide service to a nonhomogeneous rate group—meaning business and residential end-users—and that business and residential telephone usage and cost patterns differ.[10]

It is clear that the issue of an appropriate rate was fully litigated by the parties. The PUC heard a great deal of testimony regarding measured service rates in the context of private payphone providers who resell US WEST service, as well as sufficient testimony to support charging STS providers a flat rate option different from the flat rate charged other businesses. Weighing this evidence, the PUC decided that a mandatory measured

---

**9.** Testimony indicated that one STS trunk can generally replace five to eight flat business trunks.

**10.** This testimony was based on usage information released when STS was first implemented—not upon a specific usage study.

service rate was more appropriate for STS providers than any flat rate option. The PUC therefore made a choice between two possible rate structures based upon the evidence presented. This type of choice is distinctly within the PUC's expertise and discretion. *See City of Montrose v. Public Util. Comm'n,* 629 P.2d 619, 623 (Colo.1981) (when two equally reasonable courses of action are open to the PUC, the reviewing court cannot substitute its judgment for that of the PUC in selecting the appropriate alternative). Thus, viewing the record in the light most favorable to the PUC, *G & G Trucking Co. v. Public Util. Comm'n,* 745 P.2d 211, 216 (Colo.1987), we believe the PUC's decision is supported by substantial evidence.

### 3.

■ Integrated Network argues there is insufficient evidence to support the decision of the PUC. First, it contends that the only mention of mandatory measured rates for STS providers was by a PUC staff witness and that this brief reference cannot support the PUC's decision. In essence, Integrated Network appears to suggest that (1) because no party formally advocated measured service rates for STS providers, measured service rates were not an option available to the PUC, and (2) the PUC's decision was based entirely upon the testimony of the PUC staff witness. Neither of these assumptions has merit. First, it is the function of the PUC to adopt rate structures that are fair and reasonable. *Colorado Office of Consumer Counsel v. Public Util. Comm'n,* 786 P.2d 1086, 1096 (Colo.1990). In executing this duty, the PUC is not limited to options formally presented by the parties. Indeed, as noted by the PUC in order II,

> the fact that the solution wrought from the evidence by the [PUC] was not the brain child of the parties does not render it illegitimate.... The solution chosen is an integrated solution that takes into account the entire rate structure, and not just the interests of those concerned with STS.

Furthermore, the PUC's decision is based upon more then just the testimony of the PUC staff member. Specifically, in order II, the PUC stated that its decision was supported by the PUC staff's testimony as well as "all of the evidence concerning private payphones, which, like STS providers, are also resellers of basic exchange services" and the "evidence presented by the parties about STS rates."

■ Integrated Network also argues that there is no evidence regarding usage studies and no specific evidence of revenue displacement or of revenue loss. These arguments suggest that the PUC must support its rate-making decisions with quantitative evidence supported by empirical data. While it is true that quantitative information may be helpful in determining an appropriate rate for a public utility, it is not the only type of evidence that may support a decision of the PUC. We have repeatedly adhered to the precept that ratemaking "is not an exact science but a legislative function involving many questions of judgment and discretion." *City of Montrose v. Public Util. Comm'n,* 629 P.2d 619, 623 (Colo.1981); *Colorado Ute Elec. Ass'n Inc. v. Public Util. Comm'n,* 198 Colo. 534, 539, 602 P.2d 861, 864 (1979). All that is required is that a reviewing court find that the PUC's decision is supported by substantial evidence in the record—not substantial empirical evidence. § 40–6–115(3). Indeed, to require an administrative agency to support all of its ratemaking decisions with empirical data would impair the ability of such agencies to use their expertise and discretion to determine appropriate rates. Here, as discussed above, there is ample competent qualitative evidence to support the decision of the PUC, thus the PUC need not know the *precise* impact on each customer to determine that the rate is just and reasonable. *Cf. Associated Gas Distribs. v. Federal Energy Regulatory Comm'n,* 824 F.2d 981, 1008 (D.C.Cir.1987) (ratemaking decisions involve the determination of policy goals or objectives, and the selection of means to achieve them; a reviewing court is not entitled to insist on empirical data for every proposition on which the agency's selection depends).

Finally, Integrated Network argues that STS providers are not properly labelled as "resellers" of US WEST's service and that it is not "accurate to say that STS providers compete" with US WEST. This argument is

wholly without merit. There is extensive testimony in the record to support the fact that STS providers are resellers and that they do compete with US WEST.

In short, we conclude that the district court erred in setting aside the PUC's decision to impose mandatory measured service rates on STS providers, and therefore, the decision of the district court is reversed.[11]

### III

The PUC's second issue on appeal is whether the district court erred in concluding that the PUC's findings were inadequate to support its conclusion.

The district court set aside the decision of the PUC, stating the PUC's decision is not supported by substantial evidence, that it is arbitrary and capricious and that "the PUC's findings are inadequate to justify its conclusions." The district court did not explain this latter statement and neither Integrated Network nor Colorado Payphone makes any arguments attempting to justify this portion of the district court's holding.

■ It is well established that findings by the PUC need not be presented in any particular form and that findings may be implied from other findings. *Colorado Office of Consumer Counsel v. Public Util. Comm'n*, 786 P.2d 1086, 1096 (Colo.1990); *Colorado Ute Elec. Assn. v. Public Util. Comm'n*, 760 P.2d 627, 641 (Colo.1988), *appeal dismissed*, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989).

■ Here, the PUC expressly stated its rationale for adopting measured service rates for STS providers and PAL subscribers. The decision referred to evidence in the record to support such a conclusion and order II specifically addressed and rejected a number of the arguments presented before this court on appeal. Thus, we are satisfied that the PUC's findings are adequate to justify its conclusions.

### IV

■ On cross-appeal, Integrated Network and Colorado Payphone both request this court to find that the district court erred in not concluding that the PUC's decision ordering measured service rates for STS providers and PAL subscribers is unjust, discriminatory and anticompetitive, and thus, in violation of the PUC's statutory authority. In addition, Colorado Payphone argues the district court erred in affirming the decision of the PUC permitting US WEST to deny coin line facilities to private payphone providers.

### A

Section 40–3–102, 17 C.R.S. (1993), provides in pertinent part: "The power and authority is hereby vested in the public utilities commission of the state of Colorado … to prevent unjust discriminations and extortions in the rates, charges, and tariffs of such public utilities of this state." In addition, section 40–3–106(1) prohibits public utilities from granting preferential rates. Specifically, that section provides in part:

11. Though we conclude that the PUC's decision is supported by substantial evidence, it is necessary to comment on the order of the district court. We find the district court's order problematic in that it was based on the assumption that the flat rate option may be the more appropriate rate structure for PAL service and STS providers. Indeed, the court stated that the PUC's decisions "concerning flat rate option rates for PAL and shared use trunks and [Network Accesses]" are inappropriate and remanded the case to the PUC in order for the PUC to consider the *flat rate* option. Thus, it appears that the district court did not limit its review to searching the record for support of the mandatory measured service rate, and if such is the case, the district court went beyond the scope of permissible judicial review. Though the district court may be correct in observing that the flat rate option is a viable alternative for PAL subscribers and STS providers, it is axiomatic that ratemaking decisions are for the PUC—not the district court. The precise function of an administrative agency is to use its expertise to select the best alternative among a number of viable choices for the regulated entity. Whether a court would come to the same decision based upon the record is not the issue, the only issue is whether the agency's decision is supported by substantial evidence. *See City of Montrose v. Public Util. Comm'n*, 629 P.2d 619, 623 (Colo.1981) (when two equally reasonable courses of action are open to the PUC, the reviewing court cannot substitute its judgment for that of the PUC in selecting the appropriate alternative).

[N]o public utility, as to rates, charges, service, or facilities, or in any other respect, shall make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any *unreasonable difference* as to rates, charges, service, facilities, or in any respect, either between localities or as between any class of service. The [PUC] has the power to determine any question of fact arising under this section (emphasis added).

In short, the PUC is not prohibited from establishing different rate structures, as long as such differences are just and reasonable.

Colorado Payphone and Integrated Network contend that the PUC's decision to continue mandatory measured service rates for PAL subscribers and to establish such rates for STS providers, while allowing other business customers a flat rate option, is discriminatory and unjust in violation of sections 40–3–102 and 40–3–106(1). They first argue that because the cost of providing US WEST services to STS providers and PAL subscribers is equivalent to the cost of providing such service to other businesses, the rates for the two groups should be the same. Because the rate structure is not the same, they contend it is unjust and discriminatory.

There is no dispute that the cost of providing US WEST service to STS providers and PAL subscribers is similar to the cost of providing it to other business customers. There is no support, however, for the proposition that similar costs of service dictate similar rates. In fact, the contrary is true in some cases. For instance, residential rates are structured substantially lower than business rates, yet the cost of providing service to these two groups is equivalent. Thus, while cost-of-service may be a factor, it is certainly not the exclusive factor to be considered in a ratemaking decision of the PUC. Indeed, if such were the case, the PUC would have little ratemaking discretion; rather, it would become a rubber stamp relegated to examining cost studies of utilities. Accordingly, the fact that the cost of providing service to STS providers and PAL subscribers is similar to the cost of providing

service to other business customers fails to demonstrate that the PUC's decision is unlawfully discriminatory.

Integrated Network and Colorado Payphone rely on *City of Montrose v. Public Util. Comm'n*, 197 Colo. 119, 590 P.2d 502 (1979) and *Mountain States Legal Found. v. Public Util. Comm'n*, 197 Colo. 56, 590 P.2d 495 (1979), to support the argument that the PUC has unlawfully discriminated against PAL subscribers and STS providers. We do not agree that these cases support such a proposition.

In *Mountain States*, the PUC established a preferential gas rate for low-income elderly and low-income disabled persons. The only reason for adopting such a rate was to provide economic relief to needy persons. As a result of the preferential rate structure, all other customers were to pay higher rates. This court set aside the preferential gas rate. In so doing, we found the lower rates violated the prohibition against preferential rates contained in section 40–3–106(1). *Mountain States*, 197 Colo. at 59, 590 P.2d at 498.

In *City of Montrose*, the PUC ordered a gas utility to surcharge municipal franchise charges to customers living within the municipalities but not to rural customers. As a result, municipal customers would have to pay higher rates than nonmunicipal customers who receive the same service. This court set aside the decision of the PUC, concluding that surcharging municipal franchise fees is unjust and discriminatory. *City of Montrose*, 197 Colo. at 121, 590 P.2d at 504.

Here, Integrated Network and Colorado Payphone contend that STS providers and PAL subscribers are similarly situated to other US WEST business customers, and thus, under *Mountain States* and *City of Montrose*, the PUC's decision to establish different rates was discriminatory. We disagree.

In both *Mountain States* and *City of Montrose*, the PUC chose to treat similar classes of customers differently. In *Mountain States* the PUC distinguished between customers based upon income and in *City of Montrose* the PUC distinguished between customers based upon where they lived.

Here, however, there is substantial evidence in the record indicating that STS providers and PAL subscribers purchase US WEST services and then resell the services (often with some enhancements) to their respective customers for a profit. STS providers and PAL subscribers, therefore, are in competition with US WEST. Other businesses that purchase US WEST service, however, do so solely for their own use and not to resell such services for a profit. Thus, unlike the situation in *Mountain States* and *City of Montrose*, we conclude that STS providers and PAL subscribers are not similarly situated to other business customers that purchase US WEST services.

Furthermore, in both *Mountain States* and *City of Montrose*, one group of customers was charged a higher rate, thereby creating a subsidy for another group of customers. Here, STS providers and PAL subscribers were ordered to pay measured service rates. This means they will be charged based upon usage. The actual rates may be higher or lower than the business flat rate in any given month. There is no evidence that the rates paid by STS providers and PAL subscribers will be uniformly and consistently higher than other business customers, or that they will be subsidizing other customers, as was the case in *Mountain States* and *City of Montrose*.

Finally, Colorado Payphone argues that the PUC's decision is discriminatory since other resellers, such as hotels and motels, may obtain a flat rate option but PAL subscribers may not. We find this argument unpersuasive. First, unlike PAL subscribers, the primary function of hotels and motels is not to provide telecommunications services, but rather, to provide housing accommodations to travelers. In addition, hotels and motels do not resell telecommunications services to the general public, but only to those persons patronizing the hotel or motel. More importantly, the PUC indicated that a flat rate option might not be appropriate for the hotel and motel industry. Thus, instead of creating "two inappropriate rate situations" by establishing a flat rate option for PAL subscribers, the PUC ordered US

WEST to file a report so that the PUC could investigate whether hotels and motels should be required to take measured service. We believe this action is reasonable and addresses concerns raised by Colorado Payphone. *Cf. Mobile Oil Exploration & Producing Southeast Inc. v. United Distrib. Co.,* 498 U.S. 211, 231, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991) ("an agency need not solve every problem before it in the same proceeding").

In short, Integrated Network and Colorado Payphone have failed to demonstrate that the PUC's order is unjust or discriminatory. Consequently, we conclude that the PUC's decision to impose mandatory measured service rates on STS providers and continue such rates for PAL subscribers did not violate its statutory duties under the Public Utilities Law.

## B

■ In addition to the Public Utilities Law, the PUC's regulation of telecommunications services is governed by the Intrastate Telecommunications Services Act.[12] Integrated Network and Colorado Payphone argue that the PUC's decision is inconsistent with two provisions of this act.

First, they argue that the PUC's decision fails to promote competition in the telecommunications market, and thus, contravenes the legislative intent embodied in section 40–15–101, 17 C.R.S. (1993). We disagree.

Section 40–15–101 states the general policy of the state of Colorado to "promote a competitive telecommunications marketplace while protecting and maintaining the wide availability of high-quality telecommunications services." Both parties argue that because STS providers and PAL subscribers are subject to a measured service rate and other businesses may obtain a flat business rate, the PUC's decision is per se anticompetitive. Neither party points to evidence in the record to support such a position or even indicates why measured service rates will make their industries less competitive. Indeed, evidence was presented at trial that the number of public access lines in Colorado has

---

12. §§ 40–15–101 to 40–15–404, 17 C.R.S. (1993).

increased eighty-four percent since 1988, while the number of US WEST payphones has decreased by ten percent in the same period. This shift in market structure occurred while PAL subscribers were subject to measured service rates. Thus, the argument that measured service rates will hinder the growth and competitiveness of local exchange providers is not only without support, but is contradicted by evidence in the record.[13]

■ Moreover, Integrated Network and Colorado Payphone argue that the PUC's decision is discriminatory and has an anticompetitive effect which is inconsistent with a section of the Intrastate Telecommunications Services Act that provides for nondiscriminatory access charges. This argument lacks merit.

Section 40–15–105(1) states:

No local exchange provider shall, as to its pricing and provision of access, make or grant any preference or advantage to any person providing telecommunications service between exchanges nor subject any such person to, nor itself take advantage of, any prejudice or competitive disadvantage for providing access to the local exchange network. Access charges by a local exchange provider shall be cost-based, as determined by the [PUC], but shall not exceed its average price by rate element and by type of access in effect in the state of Colorado on July 1, 1987.

This section requires nondiscriminatory and cost-based "access" charges. The term "access," by definition, refers to services provided to interexchange providers.[14] *See* 40–15–102(1), (25), (28), 17 C.R.S. (1993).[15] Thus, section 40–15–105(1) is not meant to apply to

companies that provide basic local residential and business exchange services such as Integrated Network and the companies represented by Colorado Payphone.

Accordingly, we do not find the PUC's decision inconsistent with any provision of the Intrastate Telecommunications Services Act.

### C

The last issue raised on cross-appeal relates to Colorado Payphone only. It argues that the district court erred in affirming the PUC's decision not to require US WEST to provide coin lines to private payphone providers. We will review the operation of coin lines before turning to the substance of Colorado Payphone's argument.

US WEST uses coin lines to connect its payphones to the central office. These coin lines provide coin verification and return services as well as fraud protection. Coin lines are not made available to private payphone providers. Colorado Payphone requested the PUC to order US WEST to provide coin lines to private payphone providers. The PUC rejected this request and the district court affirmed this decision.

■ Colorado Payphone first argues that the PUC's decision is not supported by substantial evidence in the record. We do not agree. The PUC heard testimony that US WEST should not be ordered to provide coin lines to private payphone providers because whether or not US WEST provides a particular product or service is a business decision for US WEST that needs to be based upon a demand analysis, a cost analysis, an evaluation of technical alternatives as well as a

---

13. In addition, both Integrated Network and the companies represented by Colorado Payphone are involved in providing basic local exchange services to their customers. Section 40–15–203(1), 17 C.R.S. (1993), indicates that basic local exchange service is a regulated *monopoly* service. Thus, it is doubtful that the legislature intended to promote competition in this area.

14. Interexchange services are provided by companies such as Sprint, MCI and AT & T.

15. Access is defined as "special access and switched access." § 40–15–102(1). Special access refers to "any point-to-point or point-to-multipoint service provided by a local exchange provider dedicated to the *exclusive use of any interexchange provider* for the transmission of any telecommunications services." § 40–15–102(25) (emphasis added). Switched access is defined as "the services or facilities furnished by a local exchange company *to interexchange providers* which allow them to use the basic exchange network for origination or termination of interexchange telecommunications services." § 40–15–102(28) (emphasis added).

**1386**

determination of the viability of the product on a long term basis. Further, the PUC was informed that US WEST was in the process of analyzing those issues to make a decision that will best support the needs of both general ratepayers and the private payphone providers in Colorado. Testimony was presented that US WEST was researching alternative methods of providing answer supervision capabilities to private payphone providers as well as other customers. Based upon this information, the PUC declined to require US WEST to provide coin lines to private payphone providers but ordered US WEST to provide a report of its investigation. We believe this decision is supported by substantial evidence. *Douglas County Bd. of Comm'rs v. Public Util. Comm'n,* 866 P.2d 919, 926 (Colo.1994) (reviewing court must determine whether there is substantial evidence in the record to support the decision of the PUC).

Colorado Payphone also argues that the decision of the PUC is unjust and discriminatory because it deprives private payphones of essential services and gives US WEST a competitive advantage. Colorado Payphone does not point to any evidence in the record to indicate that the lack of coin line availability is anticompetitive. As the district court noted "there are no facts to mandate coin line availability at this point." [16] Decisions of the PUC are presumed to be reasonable and valid, and the party challenging these orders bears the burden of demonstrating the impropriety of the PUC's order. *Atchison, Topeka and Santa Fe Ry. Co. v. Public Util. Comm'n,* 763 P.2d 1037, 1041 (Colo.1988). We do not believe that Colorado Payphone has demonstrated the impropriety of the PUC's order.

### V

Accordingly, the decision of the district court affirming the decision of the PUC which refused to order US WEST to provide coin lines to private payphone providers is affirmed. The decision of the district court reversing the decision of the PUC which established measured service rates for STS

providers and continued measured service rates for PAL service is reversed and the order of the PUC is reinstated.

Justice ERICKSON concurring in the result:

I concur with the result reached by the majority. I write separately to emphasize the reasons that compel the affirmance of the Public Utilities Commission of Colorado (PUC).

In my view, the decision by the PUC to establish mandatory measured service rates for shared tenant service (STS) providers and to continue mandatory measured service rates for public access line (PAL) service is strongly supported by the distinction that STS and PAL are resale services and arbitrage in a regulated market is not in the public interest. STS and PAL providers extend resale service that is unlike the service offered by an entity that is directly regulated by the PUC because "resellers can set their own rates and change them at will, choose the markets in which they wish to do business, and enter and leave those markets at will." *Colorado Office of Consumer Counsel v. Public Util. Comm'n,* 786 P.2d 1086, 1092 (Colo.1990). Therefore, the PUC was correct in finding STS and PAL services are distinguishable from services for which the PUC sets a flat rate.

Accordingly, because there is substantial evidence in the record to support the PUC in either establishing or maintaining mandatory measured service rates for PAL and STS, I concur in the result reached by the majority.

---

**16.** To the contrary, testimony was presented that the lack of the coin line offering by US WEST has not inhibited entry into the payphone marketplace.